70 A.3d 328

**Bernard DIXON, etc., et al.**

**v.**

**FORD MOTOR COMPANY.**

**No. 82, Sept. Term, 2012.**

Court of Appeals of Maryland.

July 25, 2013.

**140**

Jonathan Ruckdeschel (Dawn P. O'Croinin of The Ruckdeschel Law Firm, LLC, Ellicott City, MD), on brief, for Petitioners/Cross–Respondents.

Michael T. Edmonds, Esquire, Timothy J. Hogan, Esquire, Law Offices of Peter T. Nicholl, Baltimore, MD, for Amicus Curiae brief in support of Petition for Writ of Certiorari.

John E. Herrick, Esquire, Nathan D. Finch, Esquire, Motley Rice, LLC, Mt. Pleasant, SC, for Amici Curiae brief of Interested Physicians and Scientific Researchers in support of Appellant.

J. Tracy Walker, IV (McGuireWoods, LLP, Richmond, VA; Robert Dale Klein and Michelle R. Mitchell of Wharton, Levin, Ehrmantraut & Klein, P.A., Annapolis, MD), on brief, for Respondent/Cross–Petitioner.

Martin S. Kaufman, Esquire, Atlantic Legal Foundation, Larchmont, NY, John Charles Sullivan, Esquire, Baltimore, MD, for Amici Curiae brief of Richard Wilson, John

Henderson Duffus, Ronald E. Gots, Dudley Herschbach, Steven Lamm, Arthur M. Langer, A. Alan Moghissi, Robert Nolan, Gordon L. Nord, Jr., Emmanuel Rubin, James D. Watson and Ann G. Wylie in support of Appellee/Cross–Appellant Ford Motor Company.

Hugh F. Young, Jr., Esquire, Product Liability Advisory Council, Inc., Reston, VA, James M. Beck, Esquire, ReedSmith, LLP, Philadelphia, PA, Rignal W. Baldwin, Esquire, Baldwin, Kagan, Gormley, LLC, Annapolis, MD, for Amicus Curiae brief of Product Liability Advisory Council, Inc. in support of Respondent/Cross–Petitioner Ford Motor Company.

Mark A. Behrens, Esquire, Christopher E. Appel, Esquire, Shook, Hardy & Bacon, L.L.P., Washington, DC, William L. Anderson, Esquire, Clifford J. Zatz, Esquire, Rebecca C. Baden, Esquire, Crowell & Moring, LLP, Washington, DC, for Amici Curiae brief of Coalition for Litigation Justice, Inc., Chamber of Commerce of the United States of America, National Association of Manufacturers, American Insurance Association, Property Casualty Insurers Association of America, American Petroleum Institute, American Chemistry Council, Alliance of Automobile Manufacturers, and NFIB Small Business Legal Center in support of Respondent/Cross–Petitioner.

Argued before BELL, C.J.,* HARRELL, BATTAGLIA, GREENE, BARBERA, McDONALD, ALAN M. WILNER (Retired, specially assigned) JJ.

WILNER, J.

Joan Dixon contracted mesothelioma, from which she eventually died. That the mesothelioma was caused by her exposure to asbestos is not in dispute. The principal issue here is,

---

* Bell, C.J., participated in the hearing of the case, in the conference in regard to its decision and in the adoption of the opinion, but he had retired from the Court prior to the filing of the opinion.

whose asbestos?[1] As germane to what is now before us, there were two possible culprits—asbestos-laden dust emanating from brakes manufactured by Ford Motor Company that Ms. Dixon's husband, Bernard, who handled those products occupationally, brought home on his clothes, and asbestos possibly contained in a compound manufactured by Georgia–Pacific Corp. that the Dixons used in building their home, in some home improvement projects, and in building an adjacent structure.[2]

The Dixons filed suit against Ford and Georgia–Pacific in the Circuit Court for Baltimore City, claiming negligence on their part in failing to warn Ms. Dixon of the danger lurking in their products. Upon his wife's death in 2009, Mr. Dixon continued the action as personal representative of her Estate and, along with the couple's four daughters, pursued a wrongful death action as well.

After a 12–day trial, the jury concluded that the only substantial contributing factor in causing Ms. Dixon's mesothelioma was the dust from the Ford brake products. On that finding, it returned substantial verdicts in favor of Mr. Dixon and his daughters against Ford and denied a cross-claim by Ford against Georgia–Pacific. The court subsequently modified those verdicts in two respects. Applying one aspect of the statutory cap on awards of non-economic damages (Mary-

---

1. Particularly in light of a case argued the same day as this one, also involving a product liability claim by a household member who contracted mesothelioma, *Georgia–Pacific v. Farrar*, 432 Md. 523, 69 A.3d 1028 (2013), it is important to note that no issue was raised in this appeal as to whether, prior to 1972, Ford was or should have been aware of the danger to household members from asbestos fibers brought into the home on the clothes of another household member. The existence of such direct or imputed knowledge seems to have been assumed which, given that Ms. Dixon's exposure to asbestos dust emanating from Ford products extended well beyond 1972, may have been appropriate. In any event, because that issue was not raised in this appeal, we have not addressed it.

2. The Dixons sued several other manufacturers of asbestos-laden products as well, but, except with respect to a claim against Honeywell International, Inc., the claims against those defendants are not before us in this appeal.

land Code, § 11–108(b)(3)(ii) of the Cts. & Jud. Proc. Article), the court reduced the amount of the verdicts,[3] and, acting under Md. Rule 2–535, the court expressed its disagreement with the jury's conclusion that the Georgia–Pacific compound was not also a substantial contributing factor and entered judgment for Ford on its cross-claim against Georgia–Pacific. All other post-trial motions, including Ford's motion to enter judgment on its cross-claim against Honeywell International, Inc., were denied.

Both the plaintiffs and Ford filed appeals to the Court of Special Appeals. Several issues were raised, but only one was addressed—the opinion evidence by the plaintiffs' principal expert, Dr. Laura Welch, that every exposure to asbestos, including the short-fiber chrysotile asbestos contained in the Ford brake products, increased the likelihood of contracting mesothelioma and thus constituted a substantial contributing cause of that disease. Based on what the intermediate appellate court believed was a "settled scientific theory of causation" known by "philosophers of science" as "probabilistic causation," the court held that Dr. Welch's opinion was not helpful to the jury and that the trial court abused its discretion in allowing it into evidence. The court reversed the judgments entered in favor of the plaintiffs and remanded the case for a new trial and, as a result, did not consider the cross-claim against Georgia–Pacific or any of the other issues raised by the parties. We granted the plaintiffs' petition for *certiorari* and a conditional cross-petition by Ford to consider the validity of the Court of Special Appeals decision and the issues raised in but not decided by that Court.[4]

---

**3.** All of the jury's awards were for non-economic damages. They totaled $15 million, as follows: (1) to Mr. Dixon, as personal representative of his wife's estate, $5 million; (2) to Mr. Dixon on his wrongful death claim, $4 million, and (3) to each of the four daughters on their wrongful deal claims, $1.5 million. As adjusted, the wrongful death awards were reduced to $426,000 for Mr. Dixon and $159,750 for each of the daughters.

**4.** There is some overlap in the four questions raised by the plaintiffs and the four raised by Ford. Eliminating the overlap, the issues, restated by us, are:

*FACTUAL BACKGROUND—SOURCES OF EXPOSURE*

The Dixons were married in 1959 and lived thereafter as a couple in Garrett County. From 1958 until 1976, Mr. Dixon worked as a poultry inspector for the U.S. Department of Agriculture, mostly at a plant in Oakland. Upon his retirement from that position, he purchased and operated an ice cream stand near Deep Creek Lake. Over a 13–year period, from the early 1960s until 1976, he worked at least two evenings a week, ten months a year, at a garage owned by a friend, Skip Bernard. In that job, he performed brake maintenance, repair, and replacement work—on average two brake jobs per week. About 95% of the brake work Mr. Dixon did involved Ford brakes, which meant that, over the 13–year period, he performed about 1,000 Ford brake jobs. All Ford brakes and braking systems during that period contained chrysotile asbestos.

In performing his brake maintenance and repairs, Mr. Dixon used compressed air and a wire brush to clean the drums and remove debris, and sand paper to remove glaze on the brake linings. If new brakes were required, he would file the edges of the new brake shoes before installing them. All

(1) Was the Court of Special Appeals correct in concluding that the trial court erred in admitting Dr. Welch's opinion testimony, and if so was the trial court's error harmless;

(2) If the Court of Special Appeals conclusion was correct, should that court have directed that a judgment be entered for Ford rather than ordering a new trial;

(3) Did the trial court err (i) in using its revisory power under Rule 2–535 in entering judgment for Ford against Georgia–Pacific, and (ii) if not, in not using that power to enter judgment on Ford's cross-claim against Honeywell—another alleged source of asbestos exposure;

(4) Does Code, Cts. & Jud. Proc. Article, § 11–108(b)(3)(ii), in capping an award for non-economic damages to multiple claimants in a wrongful death action at 150% of the maximum amount of non-economic damages that may be awarded to an individual claimant in such an action, violate Federal and State equal protection principles and Articles 5, 19, 23, and 24 of the Maryland Declaration of Rights; and

(5) Did the trial court abuse its discretion in denying Ford's motion for new trial on the grounds that (i) the jury's verdicts were inconsistent, against the weight of the evidence, and shocking, and (ii) plaintiffs' counsel's closing arguments were improper and prejudicial.

of this generated asbestos-laden dust that clung to his skin, hair, and clothes. When he returned home, in that condition, he threw his clothes in the basement for his wife to wash. Mr. Dixon testified that she would shake out the clothes and launder them. There was other testimony that, as early as 1971, one or more of the daughters also did or helped with the laundry. Evidence was presented that, for nearly 40 years, Ford warned its dealers and employees of the dangers of working with asbestos in Ford brakes but issued no warnings to anyone else.

With respect to the construction and home improvement work, Mr. Dixon said that he used drywall in the building of his house in the early 1960s, but he used a powder mixed with water to fill in the joints and did not know the brand or manufacturer of the powder. There was no evidence as to whether it was an asbestos-laden Georgia–Pacific product. In the 1970s, the Dixons built an addition to the house and a separate building on their property enclosing four apartments and space for a meat processing business. Mr. Dixon testified that he recalled using a premixed Georgia–Pacific joint compound for both the drywall seams and a textured ceiling. His wife did the sanding and the cleanup. Evidence was presented by Georgia–Pacific that from 1963 to 1974, its Ready–Mix joint compound contained 3% to 8% asbestos, that it introduced an asbestos-free compound in 1974, but that it continued to sell the asbestos compound until 1977. There was no direct evidence at trial whether the product used by the Dixons contained asbestos.[5]

### DR. WELCH'S TESTIMONY—RESTATED QUESTIONS (1) AND (2)

Prior to trial, Ford filed a motion *in limine* to exclude the plaintiffs' proposed causation testimony and to conduct a

---

5. In supplemental answers to interrogatories, the Dixons indicated that the Georgia–Pacific compound may have contained asbestos, but at trial, Mr. Dixon stated that he did not know whether the compound he and Ms. Dixon used contained asbestos. Some of the home improvement work they did was in or after 1974, when the non-asbestos compound was on the market.

*Frye/Reed* (*Frye v. United States*, 293 F. 1013 (D.C.Cir.1923); *Reed v. State*, 283 Md. 374, 391 A.2d 364 (1978)) hearing regarding testimony expected from the plaintiffs' experts. The motion was based on the assertion that there was no reliable epidemiological evidence that exposure to automotive friction products, such as brakes, causes mesothelioma and that, indeed, the evidence was that such exposure does *not* cause mesothelioma. The motion also asserted that brake dust is not asbestos because the heat generated during the braking process transforms the asbestos in the brake lining to non-fibrous forsterite.

After the filing of Ford's motion, Dr. Welch's deposition was taken, with respect to both this and other cases in which she was expected to testify. The essence of her deposition testimony, which presaged her testimony at trial, was her opinion that, if someone has mesothelioma, it is asbestos-related and that each and every exposure that makes up the sum total is a substantial contributing factor to the disease. That, plus the fact that she no longer did clinical work and had not actually examined Ms. Dixon, produced a supplemental memorandum from Ford claiming that Dr. Welch was not qualified as an expert to give an opinion regarding causation of mesothelioma in the wives of brake mechanics.[6] Ultimately, the court, concluding that it was bound by appellate decisions on the subject (though indicating some disagreement with those decisions), denied the motion, qualified Dr. Welch as an expert, and permitted her to testify.

The examination of Dr. Welch at trial was more precise than the somewhat rambling deposition examination. Importantly, for purposes of this appeal, Ford does not challenge the trial court's exercise of its discretion to qualify her as an expert. *See* Ford's principal brief at 11, n.6. Given Dr. Welch's *curriculum vitae* in the record, that is a reasonable concession. *The present challenge is to the admissibility of*

---

6. Although Dr. Welch had not physically examined Ms. Dixon, she said that she did review Ms. Dixon's medical records and took the information therein into account in forming her opinions.

her opinion that each exposure to asbestos, including asbestos-laden dust derived from asbestos contained in brake linings, may be a contributing cause to mesothelioma, which Ford maintains is not accepted by the scientific community.

Dr. Welch first addressed the question of whether exposure to asbestos-laden dust brought into the home constitutes a high or low level of exposure. She stated that studies looking at household contamination from occupational exposure showed that the household exposure constituted a high level of exposure. She explained that the asbestos fibers from a day's worth of dust on clothes, that gets shaken off, remain on the floor and in the air for a considerable period of time, so that one day's worth can produce on-going exposure for days or even months. The fibers do not dissolve or evaporate. Each day that a worker brings home dust-laden clothes adds to that on-going contamination.

She then turned her attention to the subject of dose-response and compared mesothelioma to asbestosis and lung cancer. Mesothelioma, she said, is a cancer in the lining of the lung, which has a much smaller mass than the lung itself. Asbestosis is a scarring of the tissue in the lung. It therefore takes much greater exposure to asbestos to produce the level of scarring that results in asbestosis than it does to produce mesothelioma, which is not as dependent on repeated exposure; once a cancer forms, it is there and does not get worse from further exposure. Lung cancer, she added, has multiple causes, such as smoking, whereas mesothelioma is caused predominantly by asbestos. Her conclusion was that even a low exposure to asbestos can cause mesothelioma.

Citing a number of national and international studies, including those from the World Health Organization, the Environmental Protection Agency, OSHA, and the National Cancer Institute, Dr. Welch stated that all forms of asbestos, including the chrysotile in brake linings, can create a risk of getting mesothelioma. In direct contrast to the view of Ford, she stated, based on those epidemiological studies, that "there is no question ... that all forms of asbestos cause lung cancer

and mesothelioma." When asked more specifically about epidemiological studies limited to persons working on brake linings getting mesothelioma, she said that, because mesothelioma is such a relatively rare disease (less than 2,800 cases of mesothelioma in the U.S. each year compared with nearly 200,000 annual cases of lung cancer) and because not all mechanics work on brakes, it was difficult to do a specific job-related epidemiological study, and that, in such instances, it is appropriate to look at case-control studies. Such studies, she said, have shown a connection between working on brakes and mesothelioma.

The part of Dr. Welch's opinion most directly challenged by Ford, and found useless by the Court of Special Appeals, came in response to a hypothetical question. She was asked to assume that (1) Mr. Dixon performed approximately two brake inspections or replacements a week, mostly on Ford vehicles, from the early 1960s through 1975, (2) during that period, Ford brake systems contained asbestos, (3) Mr. Dixon's work involved removing brake drums, cleaning the drums and, when needed, replacing the brake shoes, (4) he used compressed air to clean the brake drums and occasionally sanded or filed new brake shoes, which created visible dust in the air, (5) dust got on his clothing and body, (6) he did not shower before going home and wore his clothes home, (7) Ms. Dixon was a bystander to and occasionally assisted Mr. Dixon when he worked on family cars at home, (8) Ms. Dixon did the family laundry, which included shaking out Mr. Dixon's dirty work clothes, and (9) Ms. Dixon lived in the home the entire period and developed malignant pleural mesothelioma.

Based on those assumptions, Dr. Welch stated that Ms. Dixon would have been exposed to asbestos from Mr. Dixon's work on cars and that such exposure was *a* cause of her mesothelioma. She was then asked to assume that Ms. Dixon also worked with or around drywall joint compound that contained asbestos and that she was also exposed to asbestos from that compound. On those further assumptions, Dr. Welch still was of the belief that Mr. Dixon's work with Ford brake systems was a cause of the mesothelioma because

"every exposure to asbestos is a substantial contributing cause and so brake exposure would be a substantial cause even if she had other exposures." She added, somewhat more particularly, that "take-home exposures that a person has during their lifetime [are] a substantial contributing factor to the development of an asbestos-related disease if one occurs." That was because "[e]very increasing dose increases the likelihood of getting it [and] that additional doses decrease the time it takes to get the disease as exposure goes up."

Focusing on Dr. Welch's statement that "every exposure to asbestos is a substantial contributing cause," Ford insists that the trial court erred in not subjecting her conclusion to a *Frye/Reed* examination which, in its view, would have shown non-acceptance of that conclusion by the relevant scientific community. As a fallback, it urges acceptance of the Court of Special Appeals view that Dr. Welch's opinion simply was not helpful to the jury because it "conflated" scientific causation and legal causation and should have been excluded for that reason.

The major fallacy in Ford's contention that a *Frye/Reed* analysis is required is that it looks only to the "every exposure to asbestos is a substantial contributing cause" statement and largely ignores the other parts of her testimony that provide a context to that one statement. In *Montgomery Mutual v. Chesson*, 399 Md. 314, 326, 923 A.2d 939, (2007), we confirmed that the general test for determining whether to allow expert testimony is set forth in Md. Rule 5–702—that expert testimony, in the form of an opinion or otherwise, may be admitted if the court determines that the evidence will assist the trier of fact to understand the evidence or determine a fact in issue and that, in making that determination, the court shall determine whether the witness is qualified as an expert, the appropriateness of the expert testimony on the particular subject, and whether a sufficient factual basis exists to support the expert testimony.

A *Frye/Reed* analysis is required, as a prerequisite to the application of Rule 5–702, only when the proposed expert

testimony involves a "novel scientific method," in which event there must be some assurance that the novel method has gained general acceptance within the relevant scientific community and is not just the view of a dissident minority. We may take judicial notice from our own decisions that the scientific community accepts the proposition that exposure to asbestos may cause mesothelioma. That is not a novel scientific principle. More than 20 years ago, in *Eagle–Picher v. Balbos,* 326 Md. 179, 194, n. 7, 604 A.2d 445, 452, n. 7 (1992), based on evidence in the case, we flatly rejected the assertion that mesothelioma cannot be caused by exposure to chrysotile asbestos.[7] Thus, Dr. Welch's opinion that exposure to chrysotile asbestos in Ford brakes may cause mesothelioma also is not a novel scientific principle.

We determined in *Balbos* that the governing standard for liability in an asbestos case was that stated in § 431 of the Restatement (Second) of Torts—that an actor's negligent conduct is a legal cause of harm if (1) its conduct is a "substantial factor" in bringing about the harm, and (2) there is no rule of law relieving the actor from liability. We concluded as well that, in determining whether the conduct qualifies as a substantial factor, the court must consider, among other things, the nature of the product, the frequency of its use, the proximity, in distance and time, of a plaintiff to the use of the product, and the regularity of the exposure of that plaintiff to the use of the product. *Balbos,* 326 Md. at 210, 604 A.2d at 460.

In *Scapa v. Saville,* 418 Md. 496, 503, 16 A.3d 159, 163 (2011) we confirmed that the *Balbos* "frequency, regularity,

---

7. In considering Eagle–Picher's argument that there was insufficient knowledge prior to 1944 of the health hazards of exposure to asbestos to require warnings, we observed in the cited footnote:

> "Eagle would have us further limit the analysis to chrysotile asbestos. Eagle argues that its products contain only chrysotile asbestos and that mesothelioma cannot be caused by that type of asbestos. This argument ignores conflicting evidence as to both of its underpinnings. The argument also ignores that the jury could have found that the expert on whose testimony the argument rests had been substantially impeached."

and proximity" test remains "the common law evidentiary standard used for establishing substantial-factor causation in negligence cases alleging asbestos exposure." The question is whether the evidence, viewed at the appellate level in a light most favorable to the prevailing party at trial, suffices to meet that test. In *Scapa,* we held that evidence that the plaintiff, Mr. Saville, regularly handled Scapa's asbestos-containing product on a daily basis for at least one year was legally sufficient to create a jury question on proximate cause. *Id.* at 505, 16 A.3d at 164.

As noted, the evidence in this case was that Mr. Dixon worked on Ford brakes, on average, twice a week, 10 months a year, for 13 years, and that Ms. Dixon dealt with the dust-laden clothes and the ubiquitous asbestos fibers on most of those occasions. Even acknowledging that Mr. Dixon's work was part-time evening work, that translates into his bringing home asbestos-laden dust from Ford brakes on more than 1,000 days, which, in terms of Ms. Dixon's exposure to that dust, is at least on a par with Mr. Saville's exposure in terms of frequency, regularity, and proximity.

Dr. Welch's ultimate opinion was based on that evidence and more—not just the raw number of occasions that the dust was brought into the home twice a week over a 13–year period, but as well on evidence that, because the asbestos fibers brought in on each occasion remained in the home for a considerable period of time, the exposure was continuous and cumulative in effect. With that background and context, we are unwilling to conclude that Dr. Welch's opinion that each exposure increased the likelihood of contracting mesothelioma and thus constituted a substantial contributing factor involved a novel scientific theory not generally accepted in the scientific community. Her opinion was not in the context of one or two incidental exposures to Ford brakes.

In contending that Dr. Welch's one statement is not generally accepted in the scientific community, Ford cites a number of out-of-State cases, some of which, on examination, are distinguishable in a number of respects. *Smith v. Ford Motor*

*Co.*, 2013 WL 214378, 2013 U.S. Dist. LEXIS 7861 (D.Utah 2013), for example, is an unreported U.S. District Court opinion in which the judge concluded that an "every exposure" opinion was inadmissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) when the evidence showed that the plaintiff was exposed to Ford brakes only seven times 45 years before the suit was filed. A somewhat similar circumstance existed in *Butler v. Union Carbide Corporation*, 310 Ga.App. 21, 712 S.E.2d 537 (2011), an intermediate appellate court ruling affirming the disallowance, under *Daubert*, of an "every exposure" opinion, when the evidence showed that less than one percent of the product to which the plaintiff may have been exposed was that of the defendant Union Carbide.

The closest case cited, at least facially, is *Betz v. Pneumo Abex LLC*, 615 Pa. 504, 44 A.3d 27 (2012), in which the court sustained the decision of the trial judge (1) to conduct a *Frye* examination with respect to an "every exposure" opinion, and (2) to disallow the opinion as inconsistent with a "substantial factor" analysis. That case, too, though the court's opinion is a thorough one, is distinguishable. The Pennsylvania Supreme Court took the case as a test case, from among others then pending, to examine the "every exposure" theory in a global context, without regard, it seems, to any particular facts. The court made that clear in rejecting the plaintiff's urging that the case was "not a case of *de minimis* exposure," noting that "this case was selected among test cases for the any-exposure opinion as a means, in and of itself, to establish substantial-factor causation." *Id.* at 55. That is *not* the context of this case.

All we know from the court's opinion regarding the facts of the *Betz* case is that the plaintiff worked as an automobile mechanic for 44 years, during which he was exposed to asbestos-containing friction products, such as brake linings, that he eventually contracted mesothelioma, from which he died, and that the lawsuit was against several defendants. There is nothing in the court's opinion as to how many brake linings he worked with or whose. What was before the court

was the proposed expert's "broad-scale opinion on causation applicable to anyone inhaling a single asbestos fiber above background exposure levels." *Id.* at 54. That kind of opinion, if offered in a case of truly minimal exposure to the defendant's product, may well raise concerns that would need to be tested under *Frye/Reed*, but, as we have indicated, that is not what is before us here. Dr. Welch's opinion was based on evidence of repeated exposures by Ms. Dixon to high-level doses of asbestos fibers emanating from Ford brakes and must be viewed in that light.

Ford fares no better in its reliance on the Court of Special Appeals' "probabilistic causation" analysis, from which that court concluded that, in order for a trier of fact to find that exposure to a particular asbestos product constitutes a substantial contributing factor, there must not only be evidence of the quantity of the alleged exposure but also "quantitative epidemiological evidence," and that, lacking that evidence, Dr. Welch's opinion that Ms. Dixon's exposure to asbestos from Ford brakes constituted a substantial contributing factor could not have been of any help to the jury and was therefore wrongly admitted. We note initially that, despite the court's attempt in footnote 13 of its opinion to draw a distinction, that view seems directly inconsistent with the court's pronouncement in *ACandS v. Abate,* 121 Md.App. 590, 671, 710 A.2d 944, 984 (1998) rejecting that very proposition and stating "[w]e shall not hold that a plaintiff in any asbestos case must present expert testimony as to the amount of respirable asbestos fibers emitted by a particular product."

Even to the extent that philosophers of science might find some underlying merit in the court's articulation of its "probabilistic causation" analysis, its application of that analysis in reaching its ultimate conclusion improperly viewed the one statement by Dr. Welch that each exposure increased the likelihood of Ms. Dixon contracting the disease and thus was a substantial contributing factor in isolation, detached from the hypotheses on which it was based. As we have pointed out, those hypotheses, which formed a part of Dr. Welch's opinion and were supported by substantial evidence, took account not

only of the frequency of Ms. Dixon's exposure to asbestos-laden dust from Ford brakes but why that repeated exposure was of high, not low, intensity.

Viewed properly in context, the trial court did not abuse its discretion in allowing the testimony. In light of that conclusion, the issues of whether any error by the trial court was harmless and whether judgment should have been entered in favor of Ford are moot.

### CROSS–CLAIMS AGAINST GEORGIA–PACIFIC AND HONEYWELL RESTATED QUESTION (3)

■ As noted, the plaintiffs joined Georgia–Pacific and several other manufacturers as co-defendants and, until shortly before trial, maintained that Ms. Dixon's exposure to their asbestos-laden products also was a substantial contributing causes of her mesothelioma. Prior to the scheduled trial, however, the plaintiffs settled with those co-defendants and thereafter pursued their case only against Ford. By stipulation, they dismissed all of their claims against Georgia–Pacific. Because Ford had filed cross-claims against those co-defendants, however, they remained as defendants in the case, and Ford sought to show that their products were substantial contributing causes of Ms. Dixon's disease.

At the conclusion of the evidence, Ford did not move for judgment against Georgia–Pacific or Honeywell on its cross-claims, perhaps on the theory that such a motion was premature until Ford's liability to the plaintiffs was established. The issue was submitted to the jury which, as noted, answered "No" to whether Ms. Dixon's exposure to Georgia–Pacific's or Honeywell's product was a substantial contributing factor in causing her mesothelioma. Following rendition of the verdicts, Ford moved for judgment NOV under Rule 2–532 on its cross-claims against those two co-defendants, arguing that the jury's verdict with respect to them was inconsistent with its finding of liability on the part of Ford and therefore was against the weight of the evidence. Rule 2–532(a) expressly states, however, that "[i]n a jury trial, a party may move for judgment notwithstanding the verdict only if that party made

a motion for judgment at the close of all the evidence and only on the grounds advanced in support of the earlier motion."

Though recognizing some merit in Ford's contention that, until Ford's liability was established, a motion for judgment on those cross-claims would have been premature, the trial court, relying largely on *Scapa v. Saville,* 190 Md.App. 331, 348–51, 988 A.2d 1059, 1068–70 (2010) concluded that a motion for judgment was indeed a prerequisite to a motion for judgment NOV and denied the JNOV motion for that reason. Nonetheless, exercising its broad discretion under Rule 2–535 to revise an unenrolled judgment, the court struck the judgment in favor of Georgia–Pacific and entered judgment for Ford. It did so for two reasons—because of "the comments during closing arguments," upon which the court did not elaborate, and because "there was so much evidence, dramatic evidence against Georgia–Pacific." The court expressed disbelief that a reasonable jury could have found that there was no liability on the part of Georgia–Pacific. It did not have the same view with respect to Honeywell and declined to provide relief with respect to that defendant.

Neither side is entirely happy with that result. The plaintiffs complain that the trial court erred in using Rule 2–535 as an "end run" around the clear requirement of Rule 2–532(a), and Ford complains that the court erred in not providing the same relief with respect to Honeywell. As noted, the Court of Special Appeals did not address those arguments.

Although the cross-claim issue became moot under the Court of Special Appeals ruling that there was no liability on Ford's part, in light of our conclusion that the intermediate appellate court was wrong in that respect, it is moot no longer, and, indeed, raises the questions whether (1) a motion for judgment on a cross-claim that is contingent on a finding of liability on the part of the movant is permissible in advance of a finding that the movant is liable, (2) if not, there is an implied exception to the requirement in Rule 2–532(a) that such a motion be filed, and (3) if there is no such implied exception and Rule 2–532(a) would require denial of a motion

for JNOV, it is permissible or appropriate for a court to invoke Rule 2–535(a) to circumvent that requirement. Fortunately, in this case, it is not necessary to address those issues, for there is another reason, apparent in the record, to conclude that the trial court erred in effectively reversing the jury's verdict.

As we have observed, notwithstanding the plaintiffs' dismissal of their claims against Georgia–Pacific, that company remained a defendant with respect to Ford's cross-claim, and every effort was made by Ford to establish that the Georgia–Pacific product was at least *a*, if not *the*, substantial contributing cause of Ms. Dixon's mesothelioma. The critical evidence, however, which focused on (1) the Dixons' installation of drywall during the construction of their house in 1963–64, (2) construction of an addition to the house in 1971–73, (3) the installation of drywall and textured ceilings during the construction of the apartment building later in 1976–78, and (4) drywall work that Mr. Dixon did for some friends, was not altogether clear. In the three projects on their property, Ms. Dixon did much of the sanding and was exposed to the dust emanating therefrom.

The Dixons said that, when building the house in the early 1960s, they did not use a pliable compound, such as Ready–Mix, but instead used a powder that they mixed with water. There was no evidence that the powder was manufactured or marketed by Georgia–Pacific or that it contained asbestos; Mr. and Ms. Dixon both testified that they did not know who manufactured the product. They acknowledged using a Georgia–Pacific compound when constructing the addition to the home in the early 1970s, but did not specifically identify the compound as Ready–Mix. They said only that it came in buckets that had the Georgia–Pacific name or the letters GP on them. That was the case as well when building the apartments later in 1976–78.

Until 1977, Georgia–Pacific marketed a Ready–Mix compound that contained asbestos, and it is possible that the Dixons used that product when they constructed the addition

to their home and when they built the apartment building. Mr. and Ms. Dixon both acknowledged that they used a Georgia–Pacific product, although neither identified it as Ready–Mix. Beginning in 1974, however, Georgia–Pacific marketed a Ready–Mix compound that did not contain asbestos, and it is also possible that the Dixons used *that* product instead, at least when constructing the apartments. In short, there was no direct evidence that the compound they used in any of the projects was asbestos-laden Ready–Mix, although an inference to that effect was certainly permissible.

During closing argument to the jury, the plaintiffs' attorney spoke briefly about the culpability of Georgia–Pacific. He said that, until about a month before trial, he thought he could prove Ms. Dixon's exposure to Georgia–Pacific's joint compound, but that, after taking the deposition of a Georgia–Pacific witness, he concluded that he would be unable to establish that exposure. Ford objected to those statements and moved for a mistrial. The court denied the motion and instead gave a curative instruction that the attorney's statements were improper and should be disregarded. Clearly, at that point, the court was convinced that a mistrial was not called for and that the curative instruction sufficed.

In his closing argument, Ford's attorney mentioned Georgia–Pacific only in passing, noting that there was evidence that the drywall compound used by the Dixons was made by Georgia–Pacific and that asbestos was in the compound "during certain years."

 A trial circuit court's discretion under Rule 2–535(a) to revise an unenrolled judgment is broad. Although in several cases, our predecessors have referred to it as "unrestricted," in *Southern Management v. Taha,* 378 Md. 461, 495, 836 A.2d 627, 646 (2003), we observed that, because the exercise of the trial court's discretion is subject to appellate review, it is not truly unrestricted but simply broad. That is a more accurate description. The purpose of allowing that discretion, which informs any limits to it, is "to ensure that technicality does not triumph over justice." *Id.* 378 Md. at

494, 836 A.2d at 646. The purpose is not to allow the trial judge to upset jury verdicts that he or she simply does not agree with, for, if that were the standard, there would be little left to the right of jury trial in civil cases guaranteed under Articles 5 and 23 of the Maryland Declaration of Rights.

On this record, we believe that the trial court abused its discretion in setting aside the jury's verdict on the cross-claim against Georgia–Pacific. There was no direct evidence that Ms. Dixon was ever exposed to asbestos emanating from a Georgia–Pacific product. At best, an inference could fairly have been drawn that she was, which made the issue one for the jury to resolve. The court carefully and properly instructed the jury on the standards it was to apply in weighing the evidence, explaining that the jury was the sole judge of whether testimony should be believed and of the weight of the evidence and that the party asserting a cross-claim had the burden of proving it. The court told the jury that, in determining whether the party with the burden of proof met that burden, it should consider the quality of all of the evidence and that, if the evidence was evenly divided on an issue, the finding should be against the party having the burden of proof.

There is no indication that, with respect to Ford's cross-claim, the jury did anything other than what it was instructed to do and what was properly within its province to do. There was no triumph of technicality over justice. The verdict was not against the weight of the evidence but simply reflected the jury's belief that evidence of Ms. Dixon's exposure to asbestos from a Georgia–Pacific product was insufficient to show by a preponderance that such exposure was a substantial contributing factor in causing her mesothelioma. That conclusion renders the question of whether the court should have stricken the judgment for Honeywell moot.

### CAP ON AWARD OF NON–ECONOMIC DAMAGES— RESTATED QUESTION (4)

■ Maryland Code, § 11–108(b)(2) of the Cts. & Jud. Proc. Article limits the damages for non-economic loss in a personal

injury or wrongful death action to a fixed upset amount—
$500,000 for causes of action arising on or after October 1,
1994, that amount to increase by $15,000 on October 1 of each
year after 1994. Section 11–108(b)(3)(ii) provides that, in a
wrongful death action in which there are two or more claim-
ants, an award for non-economic damages may not exceed
150% of the limitation established under § 11–108(b)(2), re-
gardless of the number of claimants or beneficiaries who share
in the award. As noted, applying that statute, the court
reduced the wrongful death award to Mr. Dixon from
$5,000,000 to $426,000 and the awards to each of the four
daughters from $1,500,000 to $159,750.

There is no dispute that, under the statute in effect when
this cause of action arose, the reductions are numerically
correct. The plaintiffs' claim is that § 11–108(b)(3)(ii) violates
the Equal Protection Clause of the 14th Amendment and
Articles 5, 19, 23, and 24 of the Maryland Declaration of
Rights and that there should have been no reductions in the
jury's verdicts.

To provide some context to the plaintiffs' argument, it is
helpful to review the evolution of § 11–108. It was first
enacted in 1986 (1986 Md. Laws, ch. 639). As introduced, the
bill was limited to personal injury claims arising from medical
malpractice but, during the session, it was amended to apply
to all personal injury actions. In *Murphy v. Edmonds,* 325
Md. 342, 368, 601 A.2d 102, 114 (1992), we observed that the
bill was the product of a legislatively perceived crisis concern-
ing the availability and cost of liability insurance, especially for
persons engaged in hazardous activities or who were health
care providers. The legislative perception was derived from
the reports of two gubernatorial task forces—one concerned
with liability insurance generally and the other with medical
malpractice insurance in particular. Both reports recom-
mended a cap on non-economic damages of $250,000. The
General Assembly opted for a cap of $350,000.

The 1986 law was a simple one. It defined "non-economic
damages," it provided that, in any action for personal injury

arising on or after July 1, 1986, an award for non-economic damages may not exceed $350,000, and it required the trier of fact to itemize an award for personal injury to reflect the amounts intended for past medical expenses, future medical expenses, past loss of earnings, future loss of earnings, non-economic damages, and other damages. It said nothing about the procedure for applying the cap on non-economic damages—whether the jury was to incorporate the cap into its verdict as part of its itemization or the court was to apply the cap post-verdict, and it said nothing regarding whether the cap applied to wrongful death actions.

The first reported challenge to the cap came in what began as a product liability personal injury action in the U.S. District Court for the District of Maryland. It was not a death case. When, prior to trial, the statutory cap on non-economic damages was raised, the plaintiffs added a count for declaratory judgment seeking a determination that the cap violated the right of jury trial guaranteed by the 7th Amendment to the U.S. Constitution and Article 23 of the Maryland Declaration of Rights.

In an opinion by Judge Niemeyer, the court concluded that the statute did not infringe on the right of jury trial. He reasoned that (1) "a legislature adopting a prospective rule of law that limits all claims for pain and suffering in all cases is not acting as a fact finder in a legal controversy," and (2) the power of the legislature to define or even abolish complete causes of action necessarily included the power to define what damages may be recovered by a litigant, especially with respect to non-economic damages, which are often speculative and are not guided by any economic standard of measurement. *Franklin v. Mazda Motor Corporation,* 704 F.Supp. 1325, 1331–32 (D.Md.1989).

In considering some of the wording of the statute, Judge Niemeyer noted the requirement that the trier of fact itemize its award, so that non-economic damages can be identified for purposes of the cap, and concluded that the jury could not properly discharge that function without being instructed in

advance about the limitation and that there was "no logical reason to keep the jury in ignorance of the cap." *Id.* at 1329.

Shortly on the heels of *Franklin*, the Court of Special Appeals decided *Potomac Electric v. Smith*, 79 Md.App. 591, 558 A.2d 768 (1989), a survivor's and wrongful death action arising from the death of a child who came into contact with a downed power line. A substantial jury award of non-economic damages was reduced in accordance with the 1986 version of the statute. On appeal, the plaintiffs claimed that (1) the cap did not apply to wrongful death actions because such an action was not one for personal injury, and (2) if it did apply, it violated the right of jury trial, Article 19 of the Declaration of Rights, due process, and equal protection.

The intermediate appellate court concluded that the legislative intent was for the cap to apply to wrongful death actions but, because the plaintiffs had agreed to a lump sum award, it was not necessary to decide whether the cap applied to the amount allocated to each claimant individually. Citing Judge Niemeyer's opinion in *Franklin*, the court held that the cap did not infringe on the right of jury trial and did not violate Art. 19, due process, or, applying the rational basis test, equal protection.

The *Franklin* decision was filed in February 1989, during the pendency of the 1989 session of the General Assembly. Obviously concerned about the court's requirement that the jury be informed of the cap, the Legislature amended § 11–108 to provide that the jury not be informed of the limitation and that, if the jury awards an amount for non-economic damages that exceeds the limitation, the court shall reduce the amount to conform with the limitation. That amendment took effect July 1, 1989 and was made applicable to jury trials commenced after that date. *See* 1989 Md. Laws, ch. 629.

The next significant event in this historical chain was *Bartucco v. Wright*, 746 F.Supp. 604 (D.Md.1990), a wrongful death action filed by the parents of a child killed in an automobile accident. The jury awarded damages of $300,000 to each parent, and the defendants moved to reduce the

awards, arguing that the cap was on the aggregate award, not on the award to each parent. Synchronizing § 11–108 with the wrongful death statute, the District Court, in an opinion by Judge Garbis, rejected that approach. Relying on the Court of Special Appeals decision in *Potomac Electric*, the court concluded that the cap applied to wrongful death actions but that, in such actions, it applied to each claimant individually and not the aggregate award. Aware of the recent legislative direction that the jury not be told of the limitation, the court held that "[a]bsent a separate damage cap for each plaintiff, it would be difficult to square the need for the jury to consider each plaintiff separately in determining his or her appropriate recovery with the prohibition against informing the jury of the cap." *Id.* at 608.

This Court's first pronouncements regarding the cap came two years later in *Murphy v. Edmonds, supra,* 325 Md. 342, 601 A.2d 102, which was an ordinary personal injury action not involving death. Applying a heightened scrutiny test, the trial judge found that the cap violated equal protection and declined to reduce a $510,000 award for non-economic damages. The Court of Special Appeals disagreed with the trial court's reasoning, held that the cap was Constitutional, and directed that the award for noneconomic damages be reduced to $350,000. This Court affirmed the judgment of the intermediate appellate court.

We agreed with the Court of Special Appeals that the rational basis test was the appropriate one to apply and that § 11–108 satisfied that test. We next concluded that § 11–108 "fully preserves the right of having a jury resolve the factual issues with regard to the amount of noneconomic damages," noting that "[n]either the $350,000 limit on recovery nor the provision that the jury not be informed of the limit, interferes with the jury's proper role and its ability to resolve the factual issues which are pertinent to the cause of action." *Id.* at 373, 601 A.2d at 117. Finally, although not raised in the briefs, the Court also concluded that the cap did not amount to a restriction on access to the courts and therefore did not contravene Article 19 of the Declaration of Rights. *See* also *Oaks v.*

*Connors,* 339 Md. 24, 660 A.2d 423 (1995), confirming *Murphy* and holding that the individual cap applicable in a non-death personal injury action included damages awarded on a loss of consortium claim; there was not a separate cap for that claim.

A year later, in *United States v. Streidel,* 329 Md. 533, 620 A.2d 905 (1993), we rejected the views of the U.S. District Court in *Franklin* and the Court of Special Appeals in *Potomac Electric* and held that the General Assembly did not intend for the cap to apply to awards in wrongful death actions. That ruling had a very short shelf life. In its next session, the General Assembly amended § 11–108 to make clear that, from and after October 1, 1994, the cap applied to non-economic damages awarded in wrongful death actions. *See* 1994 Md. Laws, ch. 477.

It was in that 1994 law that the Legislature generated the issue now before us, by drawing a distinction between wrongful death actions and other personal injury cases with respect to the application of the cap. It mandated that, in personal injury actions generally, the cap on non-economic damages applied to "each direct victim of tortious conduct and all persons who claim injury through that victim," but "in a wrongful death action in which there are two or more claimants or beneficiaries, an award for noneconomic damages may not exceed 150% of the limitation ... regardless of the number of claimants or beneficiaries who share in the award."

The last relevant event came three years later, when the Legislature defined and drew a distinction between primary and secondary claimants in wrongful death actions for purposes of the cap and established a clear preference for primary claimants.[8] If the amount of non-economic damages for primary claimants equals or exceeds the applicable cap, the

---

8. A primary claimant is one who is suing because of the death of a spouse, minor child, parent of a minor child, or certain unmarried adult children. A secondary claimant is one suing for the death of a child or parent not within the definition of primary claimant. *See* § 11–108(a)(3) and (4) and Cts. & Jud. Proc. Art. §§ 3–904(d) and (e).

court must (1) reduce each individual award of a primary claimant proportionately to the total award of all primary claimants so that the total award to all claimants or beneficiaries conforms to the 150% limitation, and (2) reduce each award to a secondary claimant to zero. If the award to primary claimants does not exceed the 150% limitation, the court must enter an award to them as determined by the jury and reduce each individual award of a secondary claimant proportionately to the total of all secondary claimants so that the total award to all claimants or beneficiaries conforms to the limitation. We are not concerned with that statute in this appeal.

Although citing some Federal and State court rulings in other States striking down a cap on non-economic damages as being in violation of those States' Constitutions, the plaintiffs, presumably with some reluctance, accept this Court's determination in *Murphy* and *Oaks* that the cap on individual non-economic damage awards provided for in § 11–108(b)(2) does not infringe on the right to jury trial or, using the rational basis test, on the right to equal protection of the law. That kind of cap, they note, was based on studies showing that $250,000 would cover most claims for non-economic damages, and still allows the jury to focus on the loss suffered by each individual claimant.

What they complain about, and observe that this Court has never addressed, is the effect of creating a lump sum cap without regard to how many claimants there are and not informing the jury of that cap. They note that there were no studies attesting to the reasonableness of that kind of cap, which effectively requires the court to redistribute the jury's awards and thus ignores the jury's perception of the actual degree of loss suffered by each of the individual claimants, which may differ from one to another. They aver that the legal impact of that is to improperly invade the jury's fact-finding province and to constitute an arbitrary and discriminatory classification. Each individual with identical damages,

they urge, must receive an identical recovery.[9]

Three years ago, in *DRD v. Freed,* 416 Md. 46, 5 A.3d 45 (2010), we had a similar case, though not a similar argument, before us. *DRD* involved both a survivor's action and a wrongful death claim by the parents of a child who drowned in a pool managed by DRD. The trial court granted summary judgment to DRD in the survivor's action on the ground that there was no direct evidence that the child suffered any pain or suffering in the drowning process but allowed the wrongful death claim to go to the jury. The jury awarded aggregate non-economic damages of $4,006,412 ($2,000,706 to each parent) Applying § 11–108(b)(3)(ii), the trial court reduced the aggregate award to $1,002,500. The Court of Special Appeals reversed the summary judgment entered in the survivor's action and affirmed the reduction of the wrongful death award. *Freed v. D.R.D.,* 186 Md.App. 477, 974 A.2d 978 (2009).

We granted *certiorari* on both issues and affirmed the judgment of the Court of Special Appeals. In their brief in this Court, the Freeds acknowledged the precedential effect of *Murphy* and *Oaks* and did not try to distinguish them. Their argument was that those cases were wrongly decided and should be overturned. There was no discussion in their brief of the issue presented here—the particular impact of the 150% cap when there are multiple wrongful death claimants—and, because that issue was not argued, it was not discussed in our Opinion. *See* Brief of Respondents/Cross–Petitioners in No. 104, Sept. Term, 2009 (2009 WL 5196414).

---

**9.** As we indicated, there is no dispute between the parties with respect to the numerical calculations used in applying the cap. The jury awarded non-economic damages to the wrongful death claimants in the total amount of $10 million—$4 million (40%) for Mr. Dixon and $1.5 million (15%) for each of the four daughters. The applicable cap under § 11–108(b)(2) to an individual claimant was $710,000. Applying the 150% enhancement under § 11–108(b)(3)(ii) brought to aggregate cap to $1,065,000. The court divided that cap proportionately to the jury awards—40% (426,000) to Mr. Dixon and 15% ($159,750) to each daughter.

We agreed that *Murphy* and *Oaks* controlled, and, despite contrary rulings in other States, we saw no reason to overturn them. That sufficed to sustain the application of the 150% cap in that case, and, indeed, was the sole basis for sustaining that cap. What we are asked to do here, in effect, is to reconsider that ultimate ruling on a ground not raised or considered in that case—a new and different basis for examining the Constitutionality of the 1994 amendments to § 11–108. We shall address the argument made by the plaintiffs and not regard it as foreclosed by *Freed,*[10] but our belief that the 150% cap is not unconstitutional will not change.

In deciding to apply a cap in wrongful death actions, the 1994 Legislature was necessarily required to determine *how* the cap would be applied. In a normal personal injury action based on injuries to more than one person, each plaintiff, whether suing separately or joining with other plaintiffs, represents a separate case. Any judgments are awarded separately, on an individual basis. The plaintiffs do not share in one gross award.

That is not the case with a wrongful death action. Only one wrongful death action is permissible with respect to the death of a person. All beneficiaries seeking a recovery are required to join in that action, and one award is made, which is divided among the plaintiffs as directed by the verdict. *See* Cts. & Jud. Proc. Art. § 3–904 (1989 Repl. Vol. and 2006 Repl. Vol.). Unless that approach was to be changed, which the Legislature declined to do, any cap had to take account of it.

Three bills were introduced into the 1994 session dealing with the cap on non-economic damages—SB 283, HB 661, and HB 511. All three provided both for an increase in the cap and its extension to wrongful death actions. Although we are

---

**10.** In *Crane v. Scribner,* 369 Md. 369, 800 A.2d 727 (2002), we also had before us a wrongful death action by multiple claimants in which the 150% cap was applied to reduce the jury's verdict. The issue there was whether the cap was applicable, not whether it was valid, and we therefore did not consider the Constitutional validity of the reduction. *Id.* at 375, n. 2, 800 A.2d at 730, n. 2.

principally concerned with SB 283, which was the one that was enacted, the proceedings on the two House Bills influenced the ultimate text of SB 283. The Department of Legislative Services bill files on all three bills are voluminous. There were many letters and many formal reports on all sides of the issues—whether to impose any cap on wrongful death awards and, if so, what the amount of the cap should be and whether it should be retroactive.

As introduced, SB 283 increased the cap from $350,000 to $450,000, subject to the annual increase of $15,000, and provided that, in a wrongful death action, that cap would apply regardless of the number of claimants or beneficiaries who would share in the award. House Bill 661 increased the cap over a three-year period, in increments of $50,000, to $500,000. That aspect was prospective. It also provided, retroactively to causes of action arising on or after June 1,1986 that were not yet adjudicated, that the applicable cap applied as well in wrongful death actions, regardless of the number of claimants. House Bill 511 took a different approach. As introduced, it would have increased the cap incrementally to $750,000 and applied the cap on a per claimant basis in both ordinary personal injury actions and wrongful death actions.

Following the hearing on the House Bills, in February 1994, several members of the House Judiciary Committee requested the Medical Mutual Liability Insurance Society, which provided medical malpractice insurance to most of the physicians in the State, to provide estimates of the impact of individual caps on insurance premiums. The company responded that, if there was a single cap (as provided for in HB 661), there would be a need for an immediate overall rate increase of 15%. If there were to be two caps, there would be an immediate need for a 30% increase in premiums, and, if there were to be three caps, the immediate increase would need to be 40%. In a separate letter, the company provided statistical support for those predictions. *See* letters from David Murray, President and Chief Operating Officer of Medical Mutual, to the Chair of the House Judiciary Committee on February 22 and February 28, 1994 in the Department of Legislative Services Bill File for

HB 511 (1994). Presumably as a result of that response, HB 511 was amended in Committee to provide a single cap of 200% in multi-claimant wrongful death actions, but neither of the House Bills was enacted.

Senate Bill 283 had its hearing in the Judicial Proceedings Committee several weeks after the hearing on the House bills. The Committee was well aware of the two House bills and the correspondence from Medical Mutual regarding the impact of separate caps in wrongful death actions. Not only did some of the same people who testified on the House Bills testify on the Senate Bill, but the letters from Medical Mutual to the Judiciary Committee were provided to the Senate Committee as well. *See* Department of Legislative Services Bill File for SB 283. The Judicial Proceedings Committee kept the individual cap at $450,000 but added amendments (1) to increase the cap in wrongful death actions where there was more than one claimant to 150% of the individual cap, and (2) if the jury verdict exceeded that cap, to require the court to reduce the award proportionately. *See Senate Journal* (1994) at 1910–11.

The bill passed the Senate in that form. The House of Delegates amended the bill to conform with the amended version of HB 511—to increase the individual cap to $500,000 and the wrongful death cap where there was more than one claimant to 200% of the individual cap. *See House Journal* (1994) at 2603–05. The Senate refused to concur in the House amendments *(Senate Journal* at 3015–20), and the House refused to recede from them *(House Journal* at 3015), so the bill was referred to a Conference Committee, which agreed to an individual cap of $500,000 but otherwise rejected the House amendments and thus kept the wrongful death cap at 150% of the individual cap. *House Journal* at 3354–59. Both Houses concurred in the Conference Committee recommendations, and the bill was enacted in that form.

This history dispels the plaintiffs' contention that there was nothing before the Legislature dealing with the effect of a cap on a lump sum wrongful death award, when coupled with the jury's not being advised of the cap. It is evident that the

Legislature was well aware of the various options that had been presented and the pros and cons of each, and it reached a compromise. The legislative approach is a rational one that is entirely consistent with the long-standing statutory requirement that all individuals seeking damages for the death of a person must join in one action against the defendant and that the amount recovered is divided among the beneficiaries in shares directed by the verdict.

The 150% cap does not intrude on the jury's right to determine the relative degree of harm suffered by the individual claimants; nor does it create irrational classifications among the claimants. Section 11–108(b)(3)(ii) merely sets a limit on the gross amount of non-economic damages that may be awarded by reason of one's death which, under the wrongful death law, is then divided proportionately as determined by the jury. That is precisely what was done here. Each daughter, who was awarded 15% of the gross award by the jury, received 15% of the net amount under the cap; the surviving husband received 40%—the percentage the jury determined he should receive. The fashioning of such a cap in wrongful death actions is no more odious or unlawful than the imposition of caps in non-death personal injury actions. We find no violation of equal protection, due process, the right to jury trial, or Art. 19, and thus sustain the reductions made by the trial court.

## DENIAL OF FORD'S MOTION FOR NEW TRIAL—RESTATED QUESTION (5)

Ford complains that the trial court abused its discretion in denying Ford's motion for new trial because (1) the jury's verdict holding Ford liable to the plaintiffs was against the weight of the evidence, and (2) that verdict was influenced by improper comments by plaintiffs' attorney during closing argument. This argument need not detain us long. We have discussed in some detail the evidence presented at trial, and we have considered the comments in question and the court's conclusion that a curative instruction was sufficient. We find no abuse of discretion in the court's ruling.

JUDGMENT OF COURT OF SPECIAL APPEALS RE-
VERSED; CASE REMANDED TO THAT COURT WITH
INSTRUCTIONS TO AFFIRM THE JUDGMENTS EN-
TERED IN FAVOR OF PETITIONERS DIXON, *ET AL.*
AGAINST RESPONDENT FORD MOTOR COMPANY
AND REVERSE THE JUDGMENT ENTERED IN FAVOR
OF RESPONDENT FORD MOTOR COMPANY ON ITS
CROSS–CLAIM AGAINST GEORGIA–PACIFIC; COSTS
IN THIS COURT AND COURT OF SPECIAL APPEALS
TO BE PAID BY RESPONDENT FORD MOTOR COMPA-
NY.

BELL, C.J. and BATTAGLIA, J., dissent.

BATTAGLIA, J., dissenting, which BELL, C.J., joins.

I respectfully dissent and would affirm the excellent analy-
sis and decision of the Court of Special Appeals, *Dixon v. Ford
Motor Company,* 206 Md.App. 180, 47 A.3d 1038 (2012).