*Estela Espina, et al. v. Steven Jackson, et al.*, No. 35, September Term 2014, Opinion by Greene, J.

**LOCAL GOVERNMENT TORT CLAIMS ACT – DAMAGES CAP – CJP § 5-303 – CONSTITUTIONAL TORTS**

Under the plain language of the Local Government Tort Claims Act ("LGTCA"), CJP § 5-303(b), which provides that "a local government shall be liable for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment with the local government," the term "tortious acts or omissions" includes state constitutional torts. Applying the damages cap to Petitioners' constitutional tort claims violates neither Article 19 nor the supremacy of the Maryland Declaration of Rights, because the LGTCA does not eviscerate a claimant's right to a remedy nor operate to impair a claimant's cause of action arising out of a constitutional violation. The LGTCA damages cap is a reasonable restriction upon a claimant's remedy as against a local government entity.

**LOCAL GOVERNMENT TORT CLAIMS ACT – DAMAGES CAP – CJP § 5-303 – AGGREGATION OF SURVIVAL/WRONGFUL DEATH CLAIMS**

For the purposes of the LGTCA damages cap, "wrongful death claims, which are derivative of another person's claim of injury [the survival claim], are considered collectively as one individual claim." *Leake v. Johnson*, 204 Md. App. 387, 416, 40 A.3d 1127, 1143 (2012). Accordingly, the wrongful death claims of the decedent's son and surviving spouse are aggregated with the survival claim of the decedent's estate, and constitute "an individual claim" to which the LGTCA $200,000 limit will apply.

Circuit Court for Prince George's County
Case No. CAL0923501
Argued: January 12, 2014

IN THE COURT OF APPEALS
OF MARYLAND

No. 35

September Term, 2014

_____

ESTELA ESPINA, et al.,

v.

STEVEN JACKSON, et al.

_____

Barbera, C.J.
Harrell
Greene
Adkins
McDonald
Watts
McAuliffe, John (Retired, Specially
Assigned),

JJ.

_____

Opinion by Greene, J.

_____

Filed: March 30, 2015

At issue in the present case is the extent to which the General Assembly intended, and was within its authority, to limit a local government's financial liability under the Local Government Tort Claims Act ("LGTCA"), Md. Code (1974, 2013 Repl. Vol., 2014 Supp.), § 5-301 *et seq*. of the Courts & Judicial Proceedings Article ("CJP"), for damages resulting from violations of the state constitution. This case arises out of the fatal shooting of Manuel Espina ("Espina") by Prince George's County (the "County") police officer Steven Jackson ("Jackson"). Petitioners, Espina's estate, Estela Concepcion Jacome–Espina, Espina's surviving spouse ("Estela"), and Manuel de Jesus Espina–Jacome,[1] Espina's son ("Manuel"), filed against Jackson and the County (collectively, "Respondents") survival and wrongful death actions arising out of Espina's death, as well as a claim on behalf of Manuel for a violation of his constitutional rights arising out of his treatment and arrest following the fatal shooting of Espina. After a twenty-three day trial, Petitioners obtained a jury verdict in the amount of $11,505,000, which was reduced to a judgment and entered against both Jackson and the County. Our decision focuses not on the grim context, but rather on the effect of the LGTCA on the County's liability for a verdict rendered against its police officer for violations of the state constitution. In deciding this case, we must not succumb to the allure of bad facts for their tendency to create bad law. We recognize the importance our decision has not only on the victim's ability to receive compensation, but also on the local government's ability to provide indispensable services to its citizens as well as the stability

---

[1] Manuel, Espina's son, passed away on March 17, 2013. His death is unrelated to the case at hand. Estela is proceeding as the personal representative of Manuel's estate.

of the public fisc. For the reasons explained below, we hold that the LGTCA, where applicable, limits the damages recoverable against a local government for violations of the state constitution.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case stems from a confrontation between Espina and Jackson, occurring on August 16, 2008, which ultimately resulted in the tragic death of Espina. Prior to the confrontation, Espina was having a drink with a friend outside his apartment complex.[2] Jackson, wearing his Prince George's County police officer uniform, was patrolling the area in his marked police cruiser when he observed the two men drinking what he believed to be alcoholic beverages.[3] Hoping they would leave the area simply by virtue of his display of authority, Jackson drove past Espina and his friend twice, then parked his police cruiser and proceeded on foot towards the men. Jackson followed Espina and his friend after they entered the apartment building, using his master key to access the locked building. Once inside, a violent confrontation ensued between Jackson and Espina. Ultimately, Jackson shot and killed Espina and arrested Manuel, who had entered the apartment complex and came to his father's aid during the altercation. Although the tragic outcome of this confrontation

---

[2] At trial, the jury was informed that Espina had violated no law by drinking alcoholic beverages outside of the apartment complex.

[3] At the time of the incident, Jackson was working in his secondary employment as a security guard for the apartment complex. The parties stipulated, however, that Jackson was, at all relevant times, working within the scope of his employment as a police officer for the County.

2

is clear, the versions of events presented by the witnesses at trial lie in stark contrast. For a complete statement of the underlying events as presented by each party, we refer to the Court of Special Appeals's reported opinion. *See Espina v. Prince George's Cnty.*, 215 Md. App. 611, 620-28, 82 A.3d 1240, 1245-50 (2013).

Following extensive and conflicting testimony at trial, the jury deliberated for three days and returned a verdict in favor of Petitioners, finding that Jackson (1) violated Espina's rights under Article 24 of the Maryland Declaration of Rights, (2) assaulted and battered Espina, (3) wrongfully caused Espina's death, and (4) violated Manuel's Article 24 rights. The jury further determined that Jackson had acted maliciously in committing these acts. Petitioners were awarded damages totaling $11,505,000 as follows:[4]

- $5 million in non-economic damages for violation of Espina's Article 24 rights;
- $5,000 in economic damages for violation of Espina's Article 24 rights;
- $0 for assault and battery of Espina;
- $5 million in non-economic damages for the wrongful death of Espina (to be divided 95% to Estela and 5% to Manuel); and
- $1.5 million in non-economic damages for violation of Manuel's Article 24 rights.

No punitive damages were awarded. Thereafter, the trial court entered judgment in the amount of $11,505,000 in favor of Petitioners against Jackson and the County, jointly and severally.

---

[4] We note that the claims for violation of Espina's Article 24 rights along with the claim for assault and battery are referred to collectively as the "survivorship claims" or "survivorship action."

3

On Respondents' motion for remittitur, the trial court, looking to the LGTCA's "limits on liability," first reduced the judgment as against the County to $805,000. Subsequently, in light of the Court of Special Appeals's opinion in *Leake v. Johnson*, 204 Md. App. 387, 40 A.3d 1127 (2012), the Circuit Court further reduced the judgment entered against the County to $405,000 following Respondents' motion for reconsideration and a full hearing on the matter. Based on the jury's finding of malice and pursuant to CJP § 5-302(b)(2)(i), the Circuit Court left intact the full jury award as to Jackson. On appeal, the Court of Special Appeals affirmed the judgment in part, and reduced the award entered against the County to $400,000. *Espina*, 215 Md. App. at 647, 82 A.3d at 1262.[5]

Subsequently, we granted Petitioners' *certiorari* request, *Espina v. Jackson*, 438 Md. 142, 91 A.3d 613 (2014), to answer the following questions, which we have rephrased and reorganized for clarity:

(1) Do the LGTCA's limits on liability apply to damages arising from Petitioners' state constitutional claims?

(2) Is the imposition of the LGTCA's limits on liability to Petitioners' "self-executing" state constitutional claims permissible in light of the supremacy of the state constitution?[6]

---

[5] The reduction to $400,000 represents the Court of Special Appeals's inclusion of the $5,000 award for economic damages in the total award allowed under the LGTCA, because "the LGTCA damages cap does not differentiate between economic and non-economic damages." *Espina*, 215 Md. App. at 647, 82 A.3d at 1262.

[6] Petitioners originally phrased this question: "Can the General Assembly by statute contravene or restrict self-executing rights in the state constitution?" First, this question is misleading as it assumes that the statute at issue necessarily "contravenes" or "restricts"

(continued...)

4

(3) Are the LGTCA's limits on liability, as applied to Petitioners' state constitutional claims, permissible under Article 19?

(4) Did the Court of Special Appeals correctly apply the LGTCA's limits on liability to Petitioners' state constitutional claims, despite the jury's finding of malice and the County's stipulation as to the scope of employment?

(5) Did the Court of Special Appeals correctly reduce the verdict, as against the County, to $400,000 by reducing Petitioners' wrongful death and survivorship actions to "an individual claim" under the LGTCA?

For the reasons stated below, we shall answer each of the questions above in the affirmative and affirm the judgment of the Court of Special Appeals.

## II. DISCUSSION

In the present case, we are required to discern the extent to which the LGTCA "limits on liability" (commonly referred to as the "damages cap") apply, or may apply, to Petitioners' "self-executing"[7] state constitutional claims. In essence, Petitioners urge this Court to

---

[6](...continued)
constitutional rights. Second, Petitioners' argument on this point is that the LGTCA, if applicable, violates the supremacy of the constitution. Our rephrasing reflects, more accurately, the arguments Petitioners have made.

[7] Petitioners use the term "self-executing rights" to describe their state constitutional claims under Article 24 of the Maryland Declaration of Rights. We clarify what is meant by "self-executing." A constitutional right is self-executing where "[i]t supplies a sufficient rule by means of which the right given may be enjoyed and protected, or the duty imposed may be enforced . . . it is self-executing only so far as it is susceptible of execution." *Benson v. State*, 389 Md. 615, 628-29, 887 A.2d 525, 533 (2005) (quoting *Davis v. Burke,* 179 U.S. 399, 21 S. Ct. 210, 45 L. Ed. 249 (1900)). In other words, a self-executing right is "enforceable judicially," meaning that a private right of action exists for its violation, without the need of implementing legislation. *Id.* Article 24 is indeed "self-executing." *See Widgeon v. Eastern Shore Hosp. Ctr.*, 300 Md. 520, 536, 479 A.2d 921, 929 (1984) (continued...)

5

conclude that the LGTCA damages cap has no application to state constitutional claims, or, alternatively, if the damages cap does indeed limit recovery for violations of the state constitution, its application here violates the supremacy of the Maryland Declaration of Rights, is unconstitutional under Article 19 of the Maryland Declaration of Rights, and was improper. Respondents contend that the trial court and the Court of Special Appeals properly applied the LGTCA damages cap to Petitioners' state constitutional claims and therefore we should affirm the judgment of the Court of Special Appeals.

## A. Petitioners' State Constitutional Claims

In addressing whether the LGTCA damages cap circumscribes Petitioners' state constitutional claims, we are confronted with an issue of statutory interpretation. We have long held that "[t]he cardinal rule of statutory interpretation is to ascertain and effectuate the intent of the Legislature." *Williams v. Peninsula Reg'l Med. Ctr.*, 440 Md. 573, 580, 103 A.3d 658, 663 (2014) (citation omitted). Our primary goal "is to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by the statutory provision[.]" *Bd. of Cnty. Comm'rs v. Marcas, L.L.C.*, 415 Md. 676, 685, 4 A.3d 946, 951 (2010) (citation omitted). As we have so often explained, in undertaking this endeavor:

> [W]e begin with the normal, plain meaning of the language of the statute. If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to legislative intent ends ordinarily

---

[7](...continued)
(explaining that a private right of action for damages for a violation of Article 24 exists at common law).

6

and we apply the statute as written, without resort to other rules of construction. We neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute[.] . . . We, however, do not read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone. Rather, the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute. . . .

Where the words of a statute are ambiguous and subject to more than one reasonable interpretation, or where the words are clear and unambiguous when viewed in isolation, but become ambiguous when read as part of a larger statutory scheme, a court must resolve the ambiguity by searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process. In resolving ambiguities, a court considers the structure of the statute, how it relates to other laws, its general purpose, and the relative rationality and legal effect of various competing constructions.

In every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense.

*Marcas*, 415 Md. at 685-86, 4 A.3d at 951-52 (quoting *Lockshin v. Semsker,* 412 Md. 257, 274-76, 987 A.2d 18, 28-29 (2010)).

Accordingly, we begin with the plain language of the Act. The LGTCA provides that "[e]xcept as provided in subsection (c) of this section, a local government shall be liable for any judgment against its employee for **damages resulting from tortious acts or omissions** committed by the employee within the scope of employment with the local government." CJP § 5-303(b)(1) (emphasis added). The LGTCA further provides specific limitations on a local government's liability. Subsection (a) of § 5-303, captioned "Limitation on liability" states, in relevant part:

7

(1) Subject to paragraph (2) of this subsection, **the liability of a local government may not exceed $200,000 per an individual claim, and $500,000 per total claims that arise from the same occurrence for damages resulting from tortious acts or omissions**, or liability arising under subsection (b) of this section and indemnification under subsection (c) of this section.

(2) The limits on liability provided under paragraph (1) of this subsection do not include interest accrued on a judgment.

CJP § 5-303(a) (emphasis added). The LGTCA does not define the term "tortious acts or omissions." At issue here is whether this term includes constitutional torts.

Petitioners aver that the LGTCA damages cap has no application to their state constitutional claims, which arise out of violations of Article 24 of the Maryland Declaration of Rights. Specifically, with regard to the language of the statute, Petitioners contend that the Legislature's use of the term "tort" does not serve to encompass constitutional violations because constitutional violations are not torts within the meaning of the LGTCA. Petitioners explain that constitutional violations "are claims arising under the state constitution and not torts in the common law sense[.]" Respondents counter that the broad term "tortious acts or omissions" is plainly inclusive of all tortious conduct, including both constitutional and non-constitutional torts. Moreover, Respondents contend that constitutional violations have been "routinely referred to as 'constitutional torts'" by our courts. The Court of Special Appeals agreed with Respondents, explaining that "based upon the statutory language, case law, and legislative history, we see no basis to conclude that the legislature intended that the LGTCA damages cap not apply to claims involving constitutional violations." *Espina*, 215 Md. App.

8

at 640, 82 A.3d at 1257. We shall eliminate any uncertainty and hold, in the present case, that the LGTCA limits the amount of damages that a local government must pay for "tortious acts or omissions committed by the [local government's] employee[s] within the scope of employment" arising out of violations of Article 24 of the Maryland Declaration of Rights.

The current language of the LGTCA plainly appears to encompass constitutional torts. Our prior decisions addressing the definition of "tortious act or omission," albeit in a different context, indicate that the term encompasses state constitutional torts. For example, in *Lee v. Cline*, 384 Md. 245, 863 A.2d 297 (2004), this Court addressed "whether the Maryland Tort Claims Act [(MTCA)[8]] grants qualified immunity to state personnel for **tortious acts or omissions**, within the scope of [employment], when those acts or omissions involve violations of state constitutional rights or constitute so-called 'intentional' torts." 384 Md. at 255, 863 A.2d at 303 (emphasis added). The Court explained that "the [] language of the [MTCA] plainly appears to cover intentional torts and constitutional torts[.] . . . There are no exceptions in the statute for intentional torts or torts based upon violations of the Maryland Constitution." 384 Md. at 256, 863 A.2d at 304. Noting that there was no

---

[8] We note, the MTCA differs from the LGTCA with respect to the protection afforded to the governmental employee. As we stated in *Bd. of Educ. v. Marks-Sloan*, 428 Md. 1, 31, 50 A.3d 1137, 1155 (2012), "[i]n contrast to the complete immunity from suit given to State personnel under the MTCA, local government employees are granted only an immunity from damages under the LGTCA." *See also Holloway-Johnson v. Beall*, 220 Md. App. 195, 210, 103 A.3d 720, 729 (2014) (explaining that whereas the MTCA "[protects state government employees by granting them direct immunity from suit for acts or omissions committed within the scope of employment without actual malice. . . . By contrast, the LGTCA grants employees immunity from damages, but not from suit.").

9

basis in the statutory language to exclude constitutional torts, the Court declined to do so.

*Id.*

This Court also had occasion to discern the meaning of the term "tort" in *Green v. N.B.S., Inc.*, 409 Md. 528, 979 A.2d 279 (2009), concluding that "tortious conduct" encompassed a broad range of tortious actions. In *Green*, we were asked to review whether the general cap on non-economic damages contained in CJP § 11-108 served to limit recovery for damages arising from violations of the Consumer Protection Act (CPA). 409 Md. at 532, 979 A.2d at 281. In holding that a statutory cause of action under the CPA arising out of a personal injury was a "tort" contemplated by the cap, this Court, citing to the opinion of the intermediate appellate court, explained:

> "Tortious" is defined as "[c]onstituting a tort; wrongful." Black's Law Dictionary 1497 (7th ed. 1999). A "tort" is defined as "[a] civil wrong for which a remedy may be obtained, usually in the form of damages; a breach of a duty that the law imposes on everyone in the same relation to one another as those invovled in a given transaction." *Id.* at 1496. **Therefore, the term "tort" as defined by Blacks encompasses all "civil wrong," not just wrongs that were recognized as a civil wrong at common law.**

409 Md. at 542, 976 A.2d at 287 (emphasis added). The Court went on to note that our prior opinion in *Lee v. Cline*, *supra*, "at least suggests that the term 'tortious conduct' includes more than conduct that constituted a tort at common law." *Green*, 409 Md. at 542, 976 A.2d at 287. There, we also recognized that, in the context of § 11-108, "nothing in the legislative history suggests that the General Assembly even thought of the difference between actions claiming personal injury due to common law torts as opposed to causes of action claiming

10

personal injury arising out of statutory or constitutional torts." *Green*, 409 Md. at 544, 976 A.2d at 288.

Importantly, we have previously referred to constitutional violations as "constitutional torts." As this Court explained in *DiPino v. Davis*, "we have characterized civil violations of State Constitutional protections as 'constitutional torts,' which seems to be the common appellation now applied to them." 354 Md. 18, 50, 729 A.2d 354, 371 (1999) (citation omitted). *See also Ashton v. Brown*, 339 Md. 70, 104, 660 A.2d 447, 464 (1995) (referring to a violation of the state constitution as a "constitutional tort"). Petitioners take issue with the use of the term "constitutional tort," suggesting at oral argument that it is "sloppy legal shorthand," or mere "scholarly slang." We disagree with such a characterization, because our prior statements are consistent with our reading of the term "tortious acts or omissions" in light of the language the General Assembly elected to use.

Moreover, as we have explained on several occasions, "there is no exception in the [LGTCA] for constitutional torts. In fact, there is no exception in the statutory language for any category of torts." *Ashton*, 339 Md. at 108 n.19, 660 A.2d at 466 n.19. *See also Prince George's Cnty. v. Longtin*, 419 Md. 450, 521, 19 A.3d 859, 902 (2011) (Harrell, J., concurring and dissenting) (explaining that "[w]e implied that the LGTCA damages cap should apply to constitutional claims [in *Ashton v. Brown*]"); *Rounds v. Md.-Nat. Capital Park & Planning Comm'n*, __ Md. __, __ A.3d __ (2015) ("Nothing in the [LGTCA's] language or its legislative history indicates that the General Assembly intended to exclude

11

any category of tortious conduct committed by a local government or its employees, from the scope of the LGTCA notice requirement."). "This Court has been most reluctant to recognize exceptions in a statute when there is no basis for the exception in the statutory language." *Lee*, 384 Md. at 256, 863 A.2d at 304. Indeed, to recognize an exception not apparent in the statutory language would be contrary to our effort to "neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute." *Marcas*, 415 Md. at 685, 4 A.3d at 951 (citation omitted).

Notwithstanding our plain reading of the text of the statute, we do not read the plain language "in a vacuum," instead, we also look to the statutory scheme in which it is found. *Marcas*, 415 Md. at 685, 4 A.3d at 951. Previously, we held that the LGTCA prevented plaintiffs from proceeding on their tort claims, including those involving state constitutional violations, where the plaintiffs failed to comply with the LGTCA notice requirement. *See Rounds*, __ Md. at __ A.3d at __ (holding that, where the LGTCA is applicable, a plaintiff must comply with the Act's notice requirement in order to bring a cause of action for unliquidated damages for violations of the state constitution against a local government); *Dehn Motor Sales, LLC v. Schultz*, 439 Md. 460, 487, 96 A.3d 221, 238 (2014) (upholding the trial court's grant of summary judgment in favor of defendants on plaintiff's state constitutional tort claims for failure to comply with the LGTCA notice requirements). *See also Longtin*, 419 Md. at 521, 19 A.3d at 902 (Harrell, J., concurring and dissenting) ("[W]e recognize, at least implicitly, that the LGTCA procedural requirements (e.g., notice) apply

12

also to constitutional tort claims."); *Williams v. Maynard*, 359 Md. 379, 391, 754 A.2d 379, 386 (2000) ("The plain language of § 5-304 of the LGTCA indicates a legislative intent to make the notice requirement broadly applicable to tort actions brought directly against local governments.").

We also view the plain language in light of the statutory scheme's purpose. *Marcas*, 415 Md. at 685, 4 A.3d at 951. The language of the LGTCA begins by noting, in part, that it is "[f]or the purpose of establishing a limit on the liability of the local governments of the State." Chapter 594, Laws of Maryland 1987. As we explained previously, "[i]t is clear that the limitation on liability provision [of the LGTCA] was enacted 'for the purpose of limiting the civil liability of local government.'" *Marcas*, 415 Md. at 686, 4 A.3d at 952 (quoting S. Judicial Proceedings Comm., Summary of Com. Rep., S.B. 237, at 3 (Md. 1987)). *See also Balt. Police Dept. v. Cherkes*, 140 Md. App. 282, 324, 780 A.2d 410, 435 (2001) ("The overarching purpose of the [LGTCA] was to bring stability to what was perceived as an escalating liability picture for local governments by containing their exposure while guaranteeing payment to tort victims of judgments against employees of local government entities in certain situations."). Including Petitioners' state constitutional claims within the scope of the LGTCA damages cap is clearly consistent with the Legislature's goal of limiting civil liability.

To confirm our interpretation of the term "tort" as including Petitioners' state constitutional claims, we shall also review the legislative history as it is relied upon

13

extensively by the parties in this case. Petitioners make the dubious assertion that the legislative history is entirely devoid of any reference to constitutional violations. Our review of the legislative history demonstrates otherwise. "The [LGTCA] was passed in response to a perceived insurance crisis plaguing counties, municipalities and their employees." *Ennis v. Crenca*, 322 Md. 285, 291, 587 A.2d 485, 488 (1991). Maureen Lamb, then Vice President of the Maryland Association of Counties, testified before the Senate Judicial Proceedings Committee:

> In the Spring of 1985 the Legislative Committee of the Maryland Association of Counties became aware of the problems that local governments were having in purchasing insurance. . . . In analyzing the situation it was soon realized that the problem was greater than merely a down cycle of the insurance market. Insurance companies were not only raising prices, they were abandoning the business of insuring governments.

S. Judicial Proceedings Comm., Testimony of Maureen Lamb (Feb. 25, 1987). In direct response to this perceived liability crisis, then Governor Harry Hughes established a Task Force led by then Lieutenant Governor Joseph Curran, Jr. in 1985, which ultimately proposed the LGTCA, along with the non-economic damages cap of CJP § 11-108, the subsequent year. *See Maynard*, 359 Md. at 391, 754 A.2d at 386 (noting that the 1985 Task Force drafted the proposed LGTCA); *Murphy v. Edmonds*, 325 Md. 342, 368-69, 601 A.2d 102, 115 (1992) (explaining that the General Assembly reviewed the 1985 Task Force Report "[i]n considering whether to enact the cap on [non-economic] tort damages" contained in CJP § 11-108).

The Task Force Report, among other things, explains that the language of the LGTCA

14

"is patterned generally after the Maryland Tort Claims Act," which as we explained above includes within its scope state constitutional violations. *See Report of the Governor's Task Force to Study Liability Insurance*, 14 (Dec.1985). Moreover, the Task Force Report, which was before the Legislature in determining whether to enact the LGTCA, explicitly notes that "[i]t is obvious that the political subdivisions must have some form of liability coverage in an era when **suits involving civil rights**, environmental pollution, public safety and public employee performance abound." *Id.* at 18 (emphasis added). We also note that the Governor's Legislative Office prepared a briefing paper for submission to the General Assembly, stating:

> In January, 1986 the Maryland Municipal League [MML] conducted a survey among the cities and towns in Maryland to find out their extent of litigation. Within the last 5 years [between 1985 and 1980], nearly one half of the respondents had lawsuits filed against them. Some of the towns had multiple suits. Several of these suits asked for millions of dollars in compensatory and punitive damages. The startling fact, however, is that while only 4 suits were filed in 1980, by 1985 the number had increased 500% to 20. The seventy lawsuits reported filed against these towns between 1980-1985 sought $106 million in damages.

A summary of the MML survey, sent by MML Executive Director Jon C. Burrell on January 22, 1986, upon which the Governor's briefing paper relied, includes the "[n]umber and kinds of issues being brought," in addition to outlining the 500% increase in tort litigation from four cases in 1980-81 to twenty in 1984-85. Importantly, the summary notes that of the cities and towns subject to lawsuits between 1980 and 1985, there were fourteen "False Arrest/Police Injury" cases, four "Voting Rights Act" cases, and seven "Civil Rights Act"

15

cases.

We also note that the primary opponent of the LGTCA, the Maryland Trial Lawyers Association ("MTLA") (now the "Maryland Association for Justice"), raised concerns to the Legislature similar to those presented by Petitioners in this case. Indeed, when the LGTCA was first introduced to the General Assembly in 1986,[9] the MTLA contended that "[i]t will impose a cap on damages in all claims against local governments." Bill File to S.B. 557/H.B. 724 (1986) (emphasis in original). Against this legislative background, we find unpersuasive Petitioners' insistence that the General Assembly never considered constitutionally based tort suits. Indeed, the legislative history only furthers a conclusion that the General Assembly was aware that the LGTCA would be read as covering a broad range of civil actions, and nonetheless declined to carve out any exceptions.

We also find support for this proposition in the General Assembly's response to our decision in *Housing Authority of Baltimore City v. Bennett*, 359 Md. 356, 754 A.2d 367 (2000). In *Bennett*, this Court held that the LGTCA damage cap did not apply to *any* tort actions where the local government itself is a defendant.[10] 359 Md. at 368, 754 A.2d at 373.

---

[9] The LGTCA was reintroduced and enacted the following year. The MTLA once again opposed the Act for similar reasons. *See* Bill File to S.B. 237 (1987).

[10] Petitioners aver that our decision in *Bennett* "has made it clear that the 1987 LGTCA did not apply to claims for constitutional deprivation." Petitioners have taken the *Bennett* Court's reference to state constitutional torts out of context to support a proposition for which *Bennett* does not stand. Specifically, Petitioners rely upon the statement in *Bennett* that:

(continued...)

16

In direct response to our decision, the General Assembly enacted an emergency measure "clarifying that the monetary limits on the liability of a local government under the [LGTCA] apply to claims against local governments when named as defendants[.]" Chapter 286, Laws of Maryland 2001. Importantly, the General Assembly explained, in the uncodified sections 2 and 3 of the emergency legislation, that "it is the intent of the General Assembly that the **total liability** of a local government, directly or otherwise, in an action arising from tortious acts or omissions, may not exceed the limits on liability" and that the "Act shall apply to **any claim for damages** under [the LGTCA]" respectively. *Id.* (emphasis added). Petitioners argue that Section 3 "is nothing more than a timing provision." We disagree with Petitioners' reading, noting that Section 3 used the same timing provision as the original 1987 Act–namely, that the LGTCA applies to cases arising out of events occurring after its enactment on July 1, 1987. Section 3 clarifies that the LGTCA applies to "any claim for

---

[10](...continued)
It would not be a reasonable construction of the statutory language, however, to apply the monetary caps to tort actions directly against local governments when the bases for such actions are enactments of the General Assembly, state common law, the state constitution, or federal law.

359 Md. at 373-74, 754 A.2d at 376. Although the Court did refer to state constitutional torts, the opinion does not focus solely on state constitutional torts, or reach the conclusion Petitioners advance. Rather, the *Bennett* Court held that the LGTCA did not apply to *any* tort action brought against the local government directly. *See Marcas*, 415 Md. at 684, 4 A.3d at 950 (explaining that the holding of *Bennett* was "that the LGTCA's damages cap provision does not limit the liability of a local government in a tort action in which the local government itself is a defendant"). This, the Court noted, included state constitutional torts, as well as common law or statutory based causes of actions. *Bennett*, 359 Md. at 373-74, 754 A.2d at 376. We decline to read this statement as giving state constitutional torts the significance Petitioners ascribe.

17

damages under [the LGTCA]" arising after its enactment. Petitioners attempt to cast doubt upon this interpretation of the 2001 legislation by noting that the Legislature used the term "tortious act or omission" in Section 2, which according to Petitioners excludes state constitutional violations. As we explained above, however, this term plainly includes Petitioners' state constitutional claims.

In the interest of completeness, we now address two additional arguments advanced by Petitioners concerning the LGTCA's application to state constitutional violations. First, Petitioners argue strenuously that "Maryland local governments and their employees have never enjoyed any immunity for constitutional claims" and that the LGTCA, if applicable to state constitutional claims, would conflict with this longstanding principle. Petitioners' theory is that the General Assembly could not have intended to include state constitutional violations within the scope of the LGTCA because to do so would conflict with Maryland Law. We note that this is precisely the argument made by the MTLA in opposition to the LGTCA in 1986, *see* Bill File to S.B. 557/H.B. 724 (1986) ("[The LGTCA] will bestow immunity upon local governments in areas in which they presently have no immunity of any sort."), and again in 1987, *see* Bill File to S.B. 237 (1987) ("This Bill represents an unwarranted extension of immunities[.]"). *See also* Statement of John J. Sellinger to Sen. Judicial Proceedings Comm., S.B. 557 (March 14, 1986) ("This Bill will extend immunity above the cap to 'local governments' (and other entities which presently enjoy no immunities) for activities for which there is presently no immunity."). Despite the concern

18

of the MTLA, the Legislature declined to carve out exceptions of any sort in the LGTCA.[11]

Petitioners also argue that if this Court holds that the LGTCA damage cap applies to the case at hand, "[t]here are serious implications for all constitutional claims in Maryland." Petitioners further contend that "[t]here is, of course, no principled way to make a distinction between limiting the remedy here and limiting other constitutional claims, like takings cases[.]" We disagree for two reasons. First, our decision does not imply that *all* constitutional violations fall under the purview of the LGTCA. Indeed, such a holding would be contrary to our case law. *See Rounds*, __ Md. __ n.13, __ A.3 __ n.13 (2015) (explaining "that a cause of action may not lie for all violations of the state constitution"). Second, although we need not determine whether takings are subject to the Act's limitations on liability, as this issue is not before us, we disagree that the LGTCA damages cap as applied in the instant case would necessarily apply where a taking is alleged. We note, without deciding, that where a taking in the constitutional sense occurs, "Art. III, § 40 [of the Maryland Constitution] [gives] rise to an implied contract between the government and a private landowner [to pay just compensation]." *Widgeon v. Eastern Shore Hosp. Ctr.*, 300 Md. 520, 531, 479 A.2d 921, 926 (1984). As we stated in *Rounds*, "we do not wish to give

---

[11] The Act limits liability of local governments for damages resulting from tortious acts or omissions entered against either the employee, where the local government is required to defend and indemnify, or against the local government itself, or both. We also note that the LGTCA eliminated the ability of the local government to "assert governmental or sovereign immunity to avoid the duty to defend or indemnify an employee" acting within the scope of employment. CJP § 5-303(b)(2).

the impression that a taking in the constitutional sense would implicate the provisions of the LGTCA. Indeed, we recognize that applying the LGTCA [damages cap] to a constitutionally based taking[, or inverse condemnation (*e.g. Litz v. Md. Dept. of Env't*, 434 Md. 623, 76 A.3d 1076 (2013)),] could conflict with a vested right to just compensation[.]" __ Md. __, n.17, __ A.3d __, n.17 (2015).

## B. Supremacy

Petitioners contend that applying the LGTCA damages cap to "limit remedies for constitutional violations runs afoul of the supremacy of the state constitution." In essence, Petitioners argue that because their constitutional claims are self-executing, meaning that they arise directly from the state constitution,[12] those claims, and the remedies that flow from them, may not be limited or restricted by statute. In addition, Petitioners contend that limiting the local government's liability would clearly and impermissibly impair their cause of action arising from Art. 24, which would, again, impair their self-executing rights under Art. 24.

Petitioners cite, rather cursorily, to several out of state cases which stand for the proposition that self-executing rights may not be "restricted," "destroyed," or "limited" by statute. Upon review, however, we find these cases wholly inapposite and unpersuasive. Petitioners, for instance, cite to the Supreme Court of Colorado's 1950 opinion in *Baker v.*

---

[12] As we explained above, "self-executing" means only that the "provision is so complete, [that] it may be enforced by the courts without the need of further legislative authority or direction." *Benson*, 389 Md. at 629, 887 A.2d at 533 (citation omitted).

*Bosworth*, 222 P.2d 416 (Colo. 1950). In *Baker*, the court was asked to consider whether the legislature, by itself, could alter a provision in the state constitution providing that eight percent of the legal voters were needed to propose any law by referendum, when the constitution expressly reserved the power to propose constitutional amendments to the people, "independent of the general assembly." *Id.* at 417. The court concluded that the legislature's attempt to raise the referendum requirement to fifteen percent was plainly unconstitutional as it conflicted with the express language of the state constitution vesting all power to amend the constitution in the people. *Id.* at 417-19. In the present case, there is no such conflict. Apart from Article 19, discussed *infra*, Petitioners cite to no provision of our state constitution that is being contravened in a similar manner.

Moreover, of the numerous cases Petitioners rely upon, none involve a finding that a limitation on liability for damages in tort is unconstitutional on supremacy grounds. Indeed, the cases cited by Petitioners involve issues irrelevant to our discussion. *See, e.g., Shell v. Jefferson Cnty.*, 454 So. 2d 1331 (Ala. 1984) (addressing the validity of a statute limiting the County's authority to set sewer services rates, where such authority was unrestricted under the state constitution); *Loonan v. Woodley*, 882 P.2d 1380 (Colo. 1994) (reviewing a challenge to an initiative petition "that would require parental notification of an unemancipated minor's decision to have an abortion" for failure to collect a sufficient amount of signatures); *In re Inter-Faith Villa, L.P.*, 185 P.3d 295 (Kan. Ct. App. 2008) *abrogated by In re Mental Health Ass'n of Heartland*, 221 P.3d 580 (Kan. 2009) (reviewing

21

a decision of the Kansas State Board of Tax Appeals denying appellants' application for exemption from ad valorem taxes); *Movants to Quash Multicounty Grand Jury Subpoena v. Dixon*, 184 P.3d 546 (Okla. 2008) (reviewing a challenge concerning the authority of a multicounty grand jury to investigate illegal activity occurring in one county).

Apart from relying upon inapplicable, out of state cases, Petitioners cite to our opinion in *Longtin* for the proposition that the application of the damages cap to a constitutional claim is violative of the supremacy of the state constitution because it "impairs" a plaintiff's cause of action. We find this reliance misplaced. In *Longtin*, this Court held that the *retroactive* application of the LGTCA damages cap was unconstitutional, because "Longtin had a vested right in bringing his cause of action—with no statutory cap on damages—prior to the enactment of the LGTCA revisions." 419 Md. at 489-90, 19 A.3d at 883. In other words, in that case, the retroactive application of the cap would "impair" Longtin's right to bring a cause of action, as it existed at the time his injury accrued. *Id.* This is plainly not at issue here. Thus, *Longtin* provides no support for Petitioners' position. In our view, application of the LGTCA damages cap to state constitutional claims does not violate the supremacy of the state constitution.

### C. Article 19

Petitioners assert that the application of the LGTCA damages cap to their constitutional claims, which strips nearly 98% of the total jury verdict, is unconstitutional under Article 19 of the Maryland Declaration of Rights. Article 19 provides:

22

That every man, for any injury done to him in his person or property, ought to have remedy by the course of the Law of the land, and ought to have justice and right, freely without sale, fully without any denial, and speedily without delay, according to the Law of the land.

We have explained that Article 19 essentially "protects two interrelated rights: (1) a right to a remedy for an injury to one's person or property; [and] (2) a right of access to the courts." *Piselli v. 75th St. Med.*, 371 Md. 188, 205, 808 A.2d 508, 518 (2002). This Court set forth the history of Article 19 in *Piselli* and again in *Jackson v. Dackman*, 422 Md. 357, 30 A.3d 854 (2011):

Article 19 was part of the original Maryland Declaration of Rights adopted in 1776, although it was then designated as Article 17 of the Declaration of Rights. Except for one word, the wording today is identical to the 1776 wording.[FN]5 All of the original state constitutions adopted at the time of the Revolutionary War, except Virginia's and North Carolina's, contained provisions like Article 19. While the United States Constitution contains no comparable provision, today the constitutions of 39 states have clauses similar to Article 19. These provisions, often referred to as 'Remedy Clauses' or 'Open Courts Clauses' or 'Access to Courts Clauses,' are based on Chapter 40 of the Magna Carta or, more particularly, Lord Coke's interpretation of Chapter 40.[FN]6 For a review of the history, purpose, interpretation, and application of such clauses, *see, e.g., Smothers v. Gresham Transfer, Inc.*, 332 Or. 83, 23 P.3d 333 (2001); Comment, *The Kansas Remedy by Due Course of Law Provision: Defining a Right to a Remedy*, 47 Kan. L. Rev. 655 (1999); Hoffman, *By the Course of the Law: The Origins of the Open Courts Clause of State Constitutions*, 74 Or. L. Rev. 1279 (1995); Schuman, *The Right To A Remedy*, 65 Temp. L. Rev. 1197 (1992); Schuman, *Oregon's Remedy Guarantee*, 65 Or. L. Rev. 35 (1986); Linde, *First Things First: Rediscovering The States' Bills of Rights*, 9 U. Balt. L. Rev. 379, 385 (1980); Perry and Cooper, *Sources of Our Liberties* 341–351 (rev. ed. 1990); Stringham, *Magna Carta Fountainhead of Freedom* 54–57 (1966); Thorne, Dunham, Kurland, and Jennings, *The Great Charter* 52–61 (1965); Thompson, *Magna Carta* 97–99, 364–365 (1948). *See also* Everstine, *The General Assembly of Maryland 1634–1776* at 566 (1980).

23

[FN]5. Today's language refers to 'every man,' whereas the 1776 language referred to 'every freeman.' In light of the Equal Rights Amendment [to the Maryland Constitution], which is Article 46 of the Declaration of Rights, adopted in 1972, the provision should be read as 'every person.'

[FN]6. Article 24 of the Maryland Declaration of Rights, which also contains the phrase 'Law of the land,' is based upon Chapter 39 of the Magna Carta.

*Dackman*, 422 Md. at 376-77, 30 A.3d at 865-66 (quoting *Piselli*, 371 Md. at 204-05, 808 A.2d at 517-18). In addition, "[w]e have held that 'it is a basic tenet, expressed in Article 19 of the Maryland Declaration of Rights, that a plaintiff injured by unconstitutional state action should have a remedy to redress the wrong.'" *Piselli*, 371 Md. at 205, 808 A.2d at 518 (quoting *Dua v. Comcast Cable*, 370 Md. 604, 644, 805 A.2d 1061, 1084 (2002)).

Petitioners contend that application of the LGTCA damages cap to their constitutional claims in this case is contrary to this "basic tenet" and violates Article 19, because it effectively demolishes their remedy for constitutional violations by reducing their total judgment by approximately 98%. Thus, Petitioners argue, the LGTCA damages cap is an unreasonable restriction on their right to a remedy. Respondents counter that the application of the LGTCA to Petitioners' claims does not infringe Article 19 because the Legislature may place reasonable limits on common law actions for damages,[13] and the LGTCA damages cap is reasonable. The Court of Special Appeals agreed with Respondents, distinguishing

---

[13] Petitioners' state constitutional claims in this case arise under Article 24. A violation of rights under Article 24 gives rise to a common law action for damages. *See Widgeon v. Eastern Shore Hosp. Ctr.*, 300 Md. 520, 537-38, 479 A.2d 921, 930 (1984) ("[W]here an individual is deprived of his liberty or property interests in violation of Articles 24 and 26, he may enforce those rights by bringing a common law action for damages.").

the LGTCA cap from the substituted remedy that we held to be unreasonable in *Dackman*. *Espina*, 215 Md. App. at 644, 82 A.3d at 1260. The intermediate appellate court further concluded that the LGTCA damages cap is more like the general non-economic tort damages cap contained in CJP § 11-108, which this Court has upheld as constitutional. *Espina*, 215 Md. App. at 645, 82 A.3d at 1260.

We have previously held that the notice provision of the LGTCA does not violate Article 19. *See Rios v. Montgomery Cnty.*, 386 Md. 104, 136-39, 872 A.2d 1, 20-21 (2005). In *Rios*, we explained that "[a]bsent the enactment of the LGTCA, local governments would not be required to defend and indemnify their employees in suits arising out of non-constitutional torts committed during 'governmental' activities . . . . Therefore, the LGTCA cannot be described as restricting a 'traditional remedy or access to the courts' when it legislatively permits plaintiffs to enforce judgments obtained from suit against the employee against the local government." 386 Md. at 139, 872 A.2d at 21 (citation omitted). The Court of Special Appeals, relying on *Rios*, has also explained that, rather than *restricting* a plaintiff's right to a remedy, "the LGTCA ensures that injured persons will be compensated for their injuries—up to the damages cap—by requiring local governments to pay judgments entered against their employees and prohibiting local governments from asserting governmental immunity as a defense to that responsibility." *Holloway–Johnson v. Beall*, 220 Md. App. 195, 212-13, 103 A.3d 720, 731 (2014) (citing *Rios*, 386 Md. at 139, 872 A.2d at 21).

This is our first occasion to address specifically an Article 19 challenge to the LGTCA damages cap. At issue in this case is Petitioners' right to a remedy.[14] In reviewing an Article 19 challenge to a legislative restriction on a remedy, we apply a reasonableness test. *See Dackman*, 422 Md. at 379, 30 A.3d at 867 ("Article 19 permits the Legislature to impose a reasonable limit upon non-economic damages recoverable in tort cases.").

It is useful to begin by reviewing restrictions that we have previously held to be unreasonable. "We have indicated, with regard to causes of action to recover for violations of certain fundamental rights, that an abrogation of access to the courts which would leave the plaintiff **totally remediless** would be unreasonable." *Murphy*, 325 Md. at 366, 601 A.2d at 113 (emphasis added). Restrictions resulting in no compensation or "drastically inadequate" compensation (*i.e.*, "almost no compensation") were held to be unreasonable in *Piselli* and *Dackman*.

In *Piselli*, we were called upon to address whether the three-year statute of limitations for an action brought against a health care provider by a plaintiff whose injury occurred during childhood should commence from the discovery of the injury by the child's parents or by the child. *Piselli*, 371 Md. at 193, 808 A.2d at 510-11. In 1993, the plaintiff in that case, age 10, suffered a leg injury and was taken to the 75th Street Medical Center for

_____

[14] Remedies can be established either by common law or by statute. "Article 5 of the Maryland Declaration of Rights authorizes the General Assembly to change common law principles" including remedies. *Piselli*, 371 Md. at 214, 808 A.2d at 523. Because Article 19 prohibits unreasonable restrictions on remedies, "Article 19, therefore, is a limitation upon the General Assembly's authority under Article 5." *Piselli*, 371 Md. at 215, 808 A.2d at 524.

treatment. *Piselli*, 371 Md. at 194-95, 808 A.2d at 511-12. The treating physician at the Medical Center diagnosed the plaintiff's injury as a pulled hamstring muscle, and sent him home. *Piselli*, 371 Md. at 195, 808 A.2d at 512. Three days later, the child's leg was further injured, and he was ultimately taken to Johns Hopkins Hospital, where it was discovered that he had suffered a "slipped capital epiphysis."[15] *Id.* As a result of the injury, the child was required to restrict his mobility, and subsequently developed "avascular necrosis,"[16] which required several surgeries to correct the condition. *Id.* In 1998, five years after the injury, the child's parents filed in the United States District Court for the District of Maryland a medical malpractice action against the Medical Center. *Piselli*, 371 Md. at 196, 808 A.2d at 512. Following trial, the jury found for the plaintiff and awarded damages. *Piselli*, 371 Md. at 197, 808 A.2d at 513. For purposes of the statute of limitations, the jury found that the child's parents discovered the injury when it occurred in 1993, but that the child did not discover the injury until 1999, after the suit was filed. *Id.* Thereafter, the trial court ruled as a matter of law that the action accrued in 1993 and was therefore time-barred pursuant to CJP § 5-109. *Id.*

Before this Court, by certification from United States Court of Appeals for the Fourth

---

[15] "A slipped capital epiphysis is a "slippage through the growth plate of the ball of the hip joint," the growth plate being made of "cartilage and relatively soft." *Piselli*, 371 Md. at 195, 808 A.2d at 512.

[16] "Avascular necrosis is the 'pathologic death of one or more cells, or a portion of tissue or organ, resulting from irreversible damage . . . due to deficient blood supply.' *See* Stedman's Medical Dictionary 1185 (27th ed. 2000)." *Piselli*, 371 Md. at 195-96, 808 A.2d at 512.

Circuit, the plaintiff argued that the commencement of the statute of limitations from the time his parents discovered his injury, when he was a minor and therefore unable to bring suit on his own behalf, deprived him of his Article 19 right to access the courts and to a remedy for his injuries. *Piselli*, 371 Md. at 198, 808 A.2d at 514. We agreed, stating that by applying the three-year statute of limitations to an action arising out of an injury to a child, "the statute unfairly and unreasonably may abrogate a child's medical malpractice cause of action when the child is not at fault." *Piselli*, 371 Md. at 215, 808 A.2d at 524. In other words, by applying the three-year statute of limitations to the child's cause of action before the child could legally bring the action himself, the child was denied a remedy for his injury. Thus, we held that "barring an injured child's medical malpractice claim before the child is able to bring an action is an unreasonable restriction upon the child's right to a remedy and access to the courts guaranteed by Article 19 of the Maryland Declaration of Rights." *Piselli*, 371 Md. at 216, 808 A.2d at 524.

*Dackman* bears somewhat more similarity to the instant case than does *Piselli*, because *Dackman* involved a statutory "substituted remedy" with a maximum recovery of $17,000.00. Specifically, *Dackman* involved a provision of the Reduction of Lead Risk in Housing Act ("RLRHA") that, under certain conditions, substituted a statutory remedy in exchange for a grant of immunity to rental property owners. 422 Md. at 361, 30 A.3d at 856. The RLRHA provided, in relevant part, that a property owner would be immune from suit for injuries from lead paint ingestion, if the property were registered and in compliance with

28

the RLRHA, and, under certain conditions, if he or she had submitted to the injured tenant a "qualified offer." *Dackman*, 422 Md. at 364-68, 30 A.3d at 858-59. Under the statute, a "qualified offer" had a statutory maximum of $17,000.00, most of which would be payable directly to the injured person's service provider rather than to the injured person. *Dackman*, 422 Md. at 365-66, 30 A.3d at 859-60. The RLRHA further provided that the property owner would be required to make a "qualified offer" only if the tenant had given notice of the injured person's blood lead levels. *Dackman*, 422 Md. at 368, 30 A.3d at 860. In addition, the immunity from suit applied whether or not the tenant accepted the "qualified offer." *Dackman*, 422 Md. at 366-67, 30 A.3d at 859. Moreover, we noted, the immunity provisions indicated that they were "intended to be very broad." *Dackman*, 422 Md. at 368, 30 A.3d at 860.

The plaintiff/tenant in *Dackman* brought suit against the defendants/landlords for damages suffered due to lead ingestion while living in defendants' rental properties. 422 Md. at 370, 30 A.3d at 861. The defendants maintained that they were immune from suit, however, because they were in compliance with the RLRHA and the plaintiff had given no notice of the injured child's blood lead levels, and, consequently, the defendants had no opportunity to make a "qualified offer." *Dackman*, 422 Md. at 373, 30 A.3d at 863. The trial court granted the defendants' motion for summary judgment based on those grounds. *Dackman*, 422 Md. at 374, 30 A.3d at 864. On appeal before this Court, the plaintiff argued that the immunity provisions of the RLRHA violated Article 19. *Dackman*, 422 Md. at 375,

29

30 A.3d at 865.  We agreed.

In undertaking our Article 19 analysis, we were concerned with two possible results in *Dackman*.  The first, as in that case, involved the scenario where no qualified offer was made, or was required to be made, or where a qualified offer was rejected by the plaintiff, but the landlord nonetheless would be immune from suit.  In that situation, we explained, the plaintiffs would "have no remedy under the statute."  *Dackman*, 422 Md. at 381, 30 A.3d at 868.  Second, we considered the "substituted remedy," *i.e.*, the $17,000 maximum amount allowed for a qualified offer, paid in return for immunity from suit.  *Id*.  We concluded that the substituted remedy was "totally inadequate and unreasonable" because "the remedy which the [RLRHA] substitutes for a traditional personal injury action results in either no compensation (where no qualified offer is made or where a qualified offer is rejected) or drastically inadequate compensation (where such qualified offer is made and accepted)."  *Dackman*, 422 Md. at 381-82, 30 A.3d at 868.  Therefore, we held that the immunity provisions of the RLRHA violated Article 19.  *Dackman*, 422 Md. at 383, 30 A.3d at 869.

To summarize, in *Piselli*, we concluded that the limitations statute completely denied the injured child a remedy.  Likewise, in *Dackman*, we held that the RLRHA immunity provisions operated either to completely deny the injured child a remedy, or to provide the injured child with a "drastically inadequate" remedy of $17,000, most of which was payable directly to an individual other than the injured child or guardian.  *Dackman* is distinguishable from the case at bar, in that *Dackman* involved immunity provisions in the law that prevented

30

the claimant from bringing a case at all—the $17,000 "substituted remedy" was supposed to

be offered in exchange for claimants not bringing their claims in court. Stated differently,

in *Dackman* and *Piselli*, the statute operated to keep the injured parties out of court, such that

they could not pursue any common law action for damages in a court of law. Unlike the

plaintiffs in *Dackman* and *Piselli*, Petitioners here brought their claims in the trial court and

were awarded damages. The issue here is whether the LGTCA's $200,000 per individual

claim/$500,000 per occurrence damages cap is reasonable.

Damages caps have been upheld as reasonable under Article 19 in other contexts.[17]

Most instructive is the general non-economic tort damages cap contained in CJP § 11-108.

In *Murphy v. Edmonds*, we stated:

> Article 19 does guarantee access to the courts, but that access is subject to
> reasonable regulation. A statutory restriction upon access to the courts violates
> Article 19 only if the restriction is unreasonable. . . . There is a distinction
> between restricting access to the courts and modifying the substantive law to
> be applied by the courts. The plaintiffs' cause of action based on negligence
> was not abolished by § 11-108. Instead, § 11-108 simply modifies the law of
> damages to be applied in tort cases. While the right to recover noneconomic
> damages exceeding $350,000 was abrogated, this change in the substantive
> law is not a restriction upon access to the courts.

325 Md. at 365-66, 601 A.2d at 113-14 (citations omitted). Similarly, in this case, neither

Petitioners' cause of action nor right to bring their case in the courts has been affected by the

---

[17] In addition to damages caps, we have upheld as reasonable under Article 19 statutes of limitations where the injured claimant is an adult, *see, e.g., Hill v. Fitzgerald*, 304 Md. 689, 703, 501 A.2d 27, 34-35 (1985), spousal immunity statutes, *see Doe v. Doe*, 358 Md. 113, 129, 747 A.2d 617, 625 (2000), and notice requirements, *see Johnson v. Maryland State Police*, 331 Md. 285, 297-98, 628 A.2d 162, 168 (1993).

31

LGTCA. We agree with the Court of Special Appeals's conclusion, consistent with our own case law, that "the LGTCA damages cap modifies the law of damages applied in cases involving claims against local governments. It does not operate—as the Espinas suggest—as a restriction upon access to the courts." *Espina*, 215 Md. App. at 645, 82 A.3d at 1260.

Petitioners argue that the LGTCA damages cap is "drastically inadequate," like the substitute remedy in *Dackman*, and that the Court of Special Appeals erred in distinguishing *Dackman*. The Court of Special Appeals stated:

> The LGTCA damages cap of $200,000 per claim is over ten times the amount of the qualified offer at issue in *Dackman*. Moreover, in *Dackman*, if a qualified offer was rejected, the landlord had full immunity, including immunity against future claims by an injured child once she reaches majority, leaving a lead paint poisoned child with no remedy whatsoever. There is no similar immunity provision in the LGTCA, and plaintiffs injured by a local government may recover up to $200,000 per individual claim.

*Espina*, 215 Md. App. at 644, 82 A.3d at 1260. We agree that the LGTCA damages cap is distinguishable from *Dackman*, because the statute at issue in that case granted immunity to the alleged tortfeasor and provided a substituted remedy, in exchange for the grant of immunity, that was not only "minuscule" but also primarily payable to individuals other than the injured plaintiff. *Dackman*, 422 Md. at 382, 30 A.3d at 868. It is necessary to emphasize, however, that in comparing the $200,000 LGTCA cap to the $17,000 substituted remedy, we do not mean to imply that there is any bright line monetary value that we use to determine whether a remedy is reasonable.

Petitioners further argue that the cap is unreasonable because the maximum amount

32

allowed by the cap decreased the amount awarded by the jury in their case by approximately 98%. Respondents refute this argument as irrelevant, stating that, by comparing the jury award to the damages cap, Petitioners are improperly claiming that the cap "is unconstitutional under Article 19 'as applied' to the verdict in this case." We agree with Respondents that in undertaking our Article 19 analysis, we cannot and do not focus on the disparity between the jury award and the statutory cap. *See Prince George's Cnty. v. Longtin*, 419 Md. 450, 517 n.13, 19 A.3d 859, 900 n.13 (2011) (Harrell, J., concurring and dissenting) (rejecting the notion that a "damages cap becomes more or less valid, depending on the size of the trial award"). Rather, in assessing the reasonableness of the damages cap, the question before us is whether application of the damages cap leads to no remedy or a "drastically inadequate" remedy, *i.e*, the equivalent of "almost no compensation" to the plaintiff. *Dackman*, 422 Md. at 382, 30 A.3d at 868.

This Court has explained, "[t]o be sure, applying a damage cap does not vitiate a person's remedy altogether." *Longtin*, 419 Md. at 488, 19 A.3d at 882. In his concurring and dissenting opinion in *Longtin*, Judge Harrell further stated that "the LGTCA is not so unduly low as to equate with cutting off all remedy." 419 Md. at 520, 19 A.3d at 901 (Harrell, J., concurring and dissenting). We are unable to conclude that the LGTCA's $200,000 per individual claim/$500,000 per occurrence damages cap leaves the plaintiff "totally remediless" or is "drastically inadequate." Although not necessary for our conclusion that the cap is reasonable, we note also, as did the Court of Special Appeals, that in a case

involving malice on the part of the government employee, like in this case, the plaintiff may still attempt to enforce the judgment against the employee individually. The Legislature has determined, however, that the responsibility of the local government entity to indemnify the employee should be limited to $200,000 per individual claim and $500,000 per occurrence.[18] This decision is a matter of policy, and it is not unreasonable. *See Longtin* 419 Md. at 490, 19 A.3d at 883 ("The legislature may, in its wisdom, limit tort damages prospectively.").

Petitioners also maintain that if the LGTCA damages cap applies to constitutional violations, plaintiffs will be forced to rely on "the lesser protections" of 42 U.S.C. § 1983 actions to seek redress for their injuries. This, in Petitioners' view, would be "an extraordinary retreat for Maryland's public policy" and would render Maryland state constitutional claims a "dead letter." We agree with Respondents, however, that Petitioners' arguments in this regard are unpersuasive. Not only does 42 U.S.C. § 1983 have no bearing on this case because Petitioners elected to bring their claims under state law in state court, but also in no way does our decision cause Maryland state constitutional claims to become a "dead letter." Petitioners point out that, unlike the LGTCA, 42 U.S.C. § 1983 does not include a cap on damages and provides for an award of attorney's fees to a successful plaintiff. At the same time, however, we note that under 42 U.S.C. § 1983, a municipality

---

[18] Petitioners note that the LGTCA damages cap has not been increased since its original enactment, nor does the statute provide for annual increases, unlike § 11-108. In addition, Petitioners state that based on CPI inflation, "$200,000 in 1987 is the equivalent of approximately only $95,362.01 in 2014 dollars." The decision to alter or increase the damages cap based on inflation, however, is a matter best left to the Legislature.

34

is not vicariously liable for torts committed by its employees, unless the plaintiff shows that the tort occurred as a result of a custom, practice, or policy embraced by the municipality. *See Longtin*, 419 Md. at 492-93, 19 A.3d at 884-85 (discussing the United States Supreme Court's opinion in *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)). For this reason, we explained in *Longtin* that "Maryland's constitutional protections require more from public officials and municipalities than § 1983." *Longtin*, 419 Md. at 496, 19 A.3d at 886-87. Our decision today does not change the liability of a municipality for the torts of its employees, and in no way signals a "retreat" from Maryland's longstanding public policy of protecting individual constitutional rights.

### D. Judicial Admission and Finding of Malice

Petitioners urge this Court to "avoid the constitutional clash" purportedly created by the application of the LGTCA in this case, and hold the County liable "as it has multiple times represented it is." Petitioners aver that the County's opening statement before the jury, in which counsel explained that "if the plaintiffs' theory is true about Officer Jackson . . . then Prince George's County is going to be [liable] for it" is judicially binding on the County. Essentially, Petitioners contend that because the County said it would be liable for Jackson's conduct, the County must now pay the entire amount awarded in favor of the Espinas. Petitioners' argument is devoid of any merit. The County correctly realized that, in accordance with the LGTCA, it would be liable for Jackson's conduct committed within the scope of employment. Having stipulated to the scope of employment, the County knew it

35

would be liable *up to the limit imposed by the LGTCA* upon a verdict against Jackson and the County. We decline the invitation to take counsel's opening remarks as binding the County to the entirety of a then-unknown multimillion dollar verdict.

We also address Petitioners' apparent confusion over two related concepts: "scope of employment" and "malice." Under the LGTCA, a local government is required to defend and indemnify, up to certain limits, its employees acting within the scope of employment. CJP § 5-302(a) ("Each local government shall provide for its employees a legal defense in any action that alleges damages resulting from tortious acts or omissions committed by an employee **within the scope of employment**[.]") (emphasis added); CJP § 5-303(b)(1) ("[A] local government shall be liable for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee **within the scope of employment**[.]") (emphasis added). In other words, whether the employee acts within the scope of employment is the lynchpin of the local government's liability. Petitioners appear to suggest that the local government's liability is dependent upon the employee's malice or lack thereof. This is plainly incorrect. If the employee acts with malice, *the employee* is *also* liable. CJP § 5-302(b)(2) ("(i) An **employee shall be fully liable** for all damages awarded in an action in which it is found that the employee acted with actual malice. (ii) In such circumstances the judgment may be executed against the employee **and the local government may seek indemnification for any sums it is required to pay**[.]") (emphasis added). In other words, theoretically, Petitioners may (1) enforce the judgment entered

36

against the County, up to the limit imposed by the LGTCA because it stipulated that Jackson acted within the scope of his employment, and (2) enforce the judgment entered against Jackson in its entirety, less any amount the County pays, because he acted with malice.

## E. Aggregation of Claims

Petitioners' final question asks us to consider whether the Court of Special Appeals concluded correctly that all of Petitioners' survivorship and wrongful death claims should be reduced to one claim for the purposes of the LGTCA cap because the family's wrongful death claims were derivative of the decedent's estate's claims. In this case, the Circuit Court originally reduced the jury's verdict as to the County from $11,505,000 to $805,000,[19] but, after the Court of Special Appeals issued its opinion in *Leake v. Johnson*, 204 Md. App. 387, 40 A.3d 1127 (2012), it aggregated the wrongful death claims of the family with the survivorship claims of the decedent's estate to further reduce the verdict as to the County to $405,000: $200,000 for the survivorship/wrongful death claims, $200,000 for Manuel's claim for violation of his own constitutional rights, and $5,000 in non-economic damages. The Court of Special Appeals concluded that the Circuit Court "properly applied *Leake* when it found that Estela and Manuel's wrongful death claims were derivative of Espina's survival claim and limited recovery to $200,000." *Id.* In addition, the Court of Special Appeals concluded that the Circuit Court was correct in "finding that Manuel's constitutional claim

_____

[19] The $805,000 amount represents the total of: $200,000 for the estate's survivorship claims, $200,000 for Estela's wrongful death claim, $200,000 for Manuel's wrongful death claim, $200,000 for Manuel's constitutional claim, and $5,000 in non-economic damages.

was separate and not derivative[,]" therefore, Manuel's claim was properly reduced to $200,000. *Espina*, 215 Md. App. at 647, 82 A.3d at 1262. Finally, the Court of Special Appeals determined that the trial court erred in awarding $5,000 in economic damages, because "the LGTCA damages cap does not differentiate between economic and noneconomic damages[,]" and, therefore, the total damages award should have been reduced to $400,000. *Id*.

The answer to the question of aggregation of claims turns on the interpretation of the phrase "per an individual claim" as used in the LGTCA. CJP § 5-303(a)(1) provides that "the liability of a local government may not exceed $200,000 per an individual claim, and $500,000 per total claims that arise from the same occurrence for damages resulting from tortious acts or omissions." This Court already addressed the interpretation of this section in *Board of County Commissioners v. Marcas, L.L.C.*, 415 Md. 676, 4 A.3d 946 (2010). *Marcas* involved the application of the LGTCA damages cap in a negligence case brought by a property owner against the Board of County Commissioners of St. Mary's County. In that case, the plaintiff alleged multiple tort counts arising out of the alleged contamination of the plaintiff's property that occurred over an extended period of time. *Marcas*, 415 Md. at 678, 4 A.3d at 947. The Board of County Commissioners argued that, though the complaint included numerous counts, the complaint only asserted one "individual claim," whereas the property owner argued that each day that the property was contaminated gave rise to an "individual claim." *Marcas*, 415 Md. at 684-85, 4 A.3d at 951.

38

In *Marcas*, we began by noting that "[t]he terms, 'individual claim,' and 'same occurrence,' are not defined in the LGTCA." 415 Md. at 684, 4 A.3d at 951. In defining "individual claim," we looked to Black's Law Dictionary and determined that "[c]laim is synonymous with 'cause of action[.]'" *Marcas*, 415 Md. at 689, 4 A.3d at 953. A "cause of action," in turn, is defined as "a set of facts sufficient to justify a court in rendering judgment for the plaintiff." *Id.* (citing Paul Mark Sandler and James K. Archibald, Pleading Causes of Action 2 (4th ed. 2008)). In the context of that case, we concluded that the plaintiff's complaint, although it asserted numerous tort counts, contained one cause of action, arising from the contamination of the property caused by the county's negligence, and therefore constituted one "individual claim" for the purposes of the LGTCA damages cap. *Marcas*, 415 Md. at 689, 4 A.3d at 954. We also noted, more broadly, that "if a local government negligently fails to comply with applicable state and federal regulations pertaining to a particular landfill, and that negligence is the proximate cause of contamination to one or more adjacent properties, each adjacent property owner's claim for money damages would constitute an 'individual claim,' regardless of how many theories of recovery are asserted." *Marcas*, 415 Md. at 688, 4 A.3d at 953. Therefore, we held that if there were multiple affected properties, each property owner's claims for damages would constitute one "individual claim."[20]

---

[20] In addition, as to the definition of "same occurrence," we concluded that "(1) the 'cause' test is applicable to the determination of what does, or does not, constitute the 'same

(continued...)

In *Marcas*, we also discussed the legislative history of the LGTCA, referring specifically to the difficulties of local governments in purchasing liability insurance. We explained that "the General Assembly intended that courts would use the insurance industry's definitions of 'individual claim' and 'same occurrence' when applying [the LGTCA damages cap]." 415 Md. at 687, 4 A.3d at 952. For that reason, our cases discussing insurance caps on wrongful death claims are instructive in wrongful death cases involving the LGTCA. The Court of Special Appeals applied that reasoning in *Leake v. Johnson*, a case involving claims against police officers by the decedent's estate, wife, and son, after the decedent died as a result of injuries sustained during an arrest and subsequent transportation in a police vehicle. 204 Md. App. at 389, 40 A.3d at 1128. After trial in that case, the jury found for the plaintiffs and awarded damages "to the estate of Mr. Johnson in the amount of: (1) $87,000 for compensatory, economic damages; and (2) $5,000,050 for compensatory, non-economic damages, including pain and suffering[; and] . . . to both [sons], individually, in the amount of: (1) $34,000 for loss of financial support; and (2) $1,100,000 for non-economic damages."

---

(...continued)
occurrence' as that term is used in [CJP] § 5-303(a), and (2) continuous and repeated acts of negligence may constitute the 'same occurrence.'" *Marcas*, 415 Md. at 692, 4 A.3d at 955. Thus, in the context of that case, we held that "if a local government negligently fails to comply with applicable state and federal regulations pertaining to a particular landfill, and that negligence is the proximate cause of contamination to one or more adjacent properties, each adjacent owner's claim for money damages would arise out of the 'same occurrence,' even if the local government was negligent (1) in several different ways, and (2) for an extended period of time." *Marcas*, 415 Md. at 689-90, 4 A.3d at 954. We ultimately decided that "the individual claim cap contained in [CJP] § 5-303(a) [was] applicable to [a]ppellee's multiple claims seeking money damages." *Marcas*, 415 Md. at 692, 4 A.3d at 955.

40

*Leake*, 204 Md. App. at 399, 40 A.3d at 1134-35. For purposes of applying the LGTCA damages cap, the trial court decided that there were three individual claims arising out of one occurrence, and therefore reduced the verdict from $7,405,000 to $416,500. *Leake*, 204 Md. App. at 401-02, 40 A.3d at 1136.

Both parties in *Leake* took issue with the trial court's reduction of the verdict, based upon the unique issues presented by wrongful death claimants. The question on appeal, therefore, was "whether wrongful death claims are aggregated with a survivor claim, or considered separately, with respect to the LGTCA limitation of liability 'per an individual claim.'" *Leake*, 204 Md. App. at 412, 40 A.3d at 1142. Relying on this Court's opinions in *Daley v. United Services Automobile Association*, 312 Md. 550, 541 A.2d 632 (1988), and *Surratt v. Prince George's County*, 320 Md. 439, 578 A.2d 745 (1990), two wrongful death cases, the Court of Special Appeals explained that wrongful death claims are derivative from the claim based on the injury to the decedent. *Leake*, 204 Md. App. at 412, 40 A.3d at 1142. In *Daley*, this Court determined that where an insurance policy set a maximum recovery for bodily injury to one person, "consequential or derivative damages are computed together with the claim for injury of which they are a consequence." *Daley*, 312 Md. at 554, 541 A.2d at 634. As explained in *Leake*, this Court applied the conclusion in *Daley* regarding aggregating derivative damages in *Surratt* to conclude that "wrongful death claims were derivative of the claim based on the injury to the [decedent], and therefore, all three claims presented a single claim under [the County Charter's] 'per individual' limit of liability."

41

*Leake*, 204 Md. App. at 415, 40 A.3d at 1144. Thus, applying this Court's analysis in *Daley* and *Surratt*, the Court of Special Appeals in *Leake* held that "a wrongful death claim will be aggregated with the claim of the injured person in applying the LGTCA limitation of liability of a local government to $200,000 per an 'individual claim.'" *Leake*, 204 Md. App. at 417, 40 A.3d at 1145.

Petitioners in this case contend that the lower courts' reliance on *Leake* to aggregate their wrongful death claims for the purposes of the LGTCA damages cap is inconsistent with the Court of Special Appeals's opinion in *Goss v. Estate of Jennings*, 207 Md. App. 151, 51 A.3d 761 (2012). In *Goss*, filed shortly after *Leake*, in which the court refused to aggregate wrongful death and survivorship claims for the purposes of applying the general non-economic tort damages cap contained in CJP § 11-108. *Goss*, 207 Md. App. at 173-74, 51 A.3d at 773-74. In that case, Jennings, a prison inmate, was struck and killed by a dump truck owned and operated by Goss during a highway litter pickup detail. *Goss*, 207 Md. App. at 157, 51 A.3d at 764. Following his death, Jennings's estate, the estate of his mother, and three beneficiaries filed a wrongful death/survival action. *Id.* The jury found for the plaintiffs and awarded damages in both the survival and wrongful death actions. *Id.* On the defendant's post-trial motion, the trial court reduced only the wrongful death award pursuant to CJP § 11-108, and left the jury's survival award intact. *Goss*, 207 Md. App. at 163, 51 A.3d at 768. On appeal, the Court of Special Appeals affirmed, relying on the key provisions of CJP § 11-108 relating specifically to damages in wrongful death actions. *Goss*, 207 Md.

42

App. at 172-73, 51 A.3d at 773-74.

In *Goss*, the Court of Special Appeals specifically distinguished *Leake*, stating "that conclusion turned on the particular language of the LGTCA, where the cap was keyed to claims that arise from 'the same occurrence.' Quite simply, *Leake*'s holding flowed from the extremely narrow language of the LGTCA." *Goss*, 207 Md. App. at 173-74, 51 A.3d at 774 (citations omitted). This statement is not exactly an accurate characterization of the court's holding in *Leake* because the *Leake* court concluded that the wrongful death and survival claims should be aggregated because they constitute "an individual claim" as used in the LGTCA, rather than arising from "the same occurrence." Nevertheless, we agree with the *Goss* court's ultimate conclusion that *Leake* is distinguishable from *Goss* based on the difference between the LGTCA and CJP § 11-108. As explained in *Goss* and in our own cases, CJP § 11-108 was amended in 1994 "to make clear that, from and after October 1, 1994, the cap applied to non-economic damages awarded in wrongful death actions. *See* 1994 Md. Laws, ch. 477." *Dixon v. Ford Motor Co.*, 433 Md. 137, 163, 70 A.3d 328, 343 (2013). In doing so, the General Assembly also provided a damages cap specifically for wrongful death plaintiffs, as compared to plaintiffs in personal injury cases. *See* CJP § 11-108(b)(3)(ii); *Goss*, 207 Md. App. at 173, 51 A.3d at 774 ("While the 1994 legislature . . . focused in part on [the difference between multiple claimants in a personal injury case and multiple claimants in a wrongful death case] in capping wrongful death damages, the State made no fundamental change to damage awards in personal injury cases, including a survival

43

action.").[21] The LGTCA makes no such distinction. In other words, the LGTCA contains "extremely narrow language" applicable to all claims brought under it. *Goss*, 207 Md. App. at 174, 51 A.3d at 774.

Petitioners also contend that *Leake* is inconsistent with our opinion in *Marcas*, which they assert stands for the principle that each legally cognizable plaintiff may bring a separate "claim" for purposes of calculating the LGTCA damage cap. We disagree. First, *Marcas* involved a single plaintiff who filed numerous tort claims against the county arising out of contamination of the plaintiff's property. 415 Md. at 679, 4 A.3d at 947-48. Second, our statement in that case that "if a local government['s] . . . negligence is the proximate cause of contamination to one or more adjacent properties, each adjacent property owner's claim for money damages would constitute an 'individual claim,'" 415 Md. at 688, 4 A.3d at 953, does not mean that any "legally cognizable plaintiff" in any action would have an "individual

---

[21] With regard to the distinction between a "normal" personal injury case and a wrongful death case, we have explained:

> In a normal personal injury action based on injuries to more than one person, each plaintiff, whether suing separately or joining with other plaintiffs, represents a separate case. Any judgments are awarded separately, on an individual basis. The plaintiffs do not share in one gross award. That is not the case with a wrongful death action. Only one wrongful death action is permissible with respect to the death of a person. All beneficiaries seeking a recovery are required to join in that action, and one award is made, which is divided among the plaintiffs as directed by the verdict.

*Dixon v. Ford Motor Co.*, 433 Md. 137, 166, 70 A.3d 328, 345 (2013). *See also* CJP § 3-904(f) ("Only one action under this subtitle lies in respect to the death of a person.").

claim" for purposes of the LGTCA. Rather, an "individual claim," as we defined it in *Marcas*, will depend on the cause of action and the set of facts necessary to create that cause of action. *See* 415 Md. at 689, 4 A.3d at 953.

We are mindful of our longstanding principle that wrongful death and survival actions are "separate and distinct." *Owens-Corning Fiberglas Corp. v. Garrett*, 343 Md. 500, 537 n.23, 682 A.2d 1143, 1161 n.23 (1996) ("*Stewart v. United Elec. Light & Power,* 104 Md. 332, 65 A. 49 (1906) . . . . stands for the proposition that survival actions are separate and distinct from wrongful death actions."). At the same time, however, "it is not wholly incorrect to state that a wrongful death claim is derivative of the decedent's claim in some sense. The two actions stem from the same underlying conduct[.]" *Mummert v. Alizadeh*, 435 Md. 207, 222, 77 A.3d 1049, 1058 (2013). As explained above, for the purpose of damage awards, "consequential or derivative damages are computed together with the claim for bodily injury of which they are a consequence." *Daley*, 312 Md. at 554, 541 A.2d at 634. Based on our review of *Marcas*, *Daley*, *Surratt*, and *Leake*, we agree with the Court of Special Appeals's conclusion that, for the purposes of the LGTCA damages cap, "wrongful death claims, which are derivative of another person's claim of injury [the survival claim], are considered collectively as one individual claim." *Leake*, 204 Md. App. at 416, 40 A.3d at 1144. Accordingly, we affirm the judgment of the Court of Special Appeals aggregating Estela and Manuel's wrongful death claims with the estate's survivorship claims for the purpose of limiting recovery to $200,000. Like the Court of Special Appeals, we leave intact

the $200,000 award for Manuel's claim for violation of his constitutional rights.  Manuel's claim arises out of Jackson's treatment of him during the confrontation.  It is not derivative of the estate's survivorship claims, which arise out of the fatal shooting of Espina.  Therefore, Manuel's claim constitutes "an individual claim" under the LGTCA separate from the survivorship/wrongful death claims.  Thus, Petitioners' recovery against the County is limited to $400,000.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. PETITIONERS TO PAY COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS.**